# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-IA-00743-SCT

*ROMAN CATHOLIC DIOCESE OF JACKSON,*
*MISSISSIPPI, AND BISHOP WILLIAM R. HOUCK*

*v.*

*KENNETH MORRISON, FRANCIS MORRISON,*
*THOMAS MORRISON, AND DOROTHY*
*MORRISON*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/31/2003 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN JEFFREY TROTTER |
| | JANET McMURTRAY |
| | L. MARTIN NUSSBAUM |
| | ERIC V. HALL |
| ATTORNEYS FOR APPELLEES: | JOHN F. HAWKINS |
| | CHRISTINA CARROLL |
| | DAVID WAYNE BARIA |
| | ORLANDO RODRIQUEZ RICHMOND |
| | ANTHONY RENARD SIMON |
| | MARY MARVEL FYKE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART, VACATED IN PART,  AND REMANDED - 05/05/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

NO. 2003-IA-00744-SCT

*ROMAN CATHOLIC DIOCESE OF JACKSON,*
*MISSISSIPPI, AND BISHOP WILLIAM R. HOUCK*

*v.*

*KENNETH MORRISON, FRANCIS MORRISON,*
*THOMAS MORRISON, AND DOROTHY*
*MORRISON*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/18/2003 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN JEFFREY TROTTER |
| | JANET McMURTRAY |
| | L. MARTIN NUSSBAUM |
| | ERIC V. HALL |
| ATTORNEYS FOR APPELLEES: | JOHN F. HAWKINS |
| | CHRISTINA CARROLL |
| | DAVID WAYNE BARIA |
| | ORLANDO RODRIQUEZ RICHMOND |
| | ANTHONY RENARD SIMON |
| | MARY MARVEL FYKE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART, VACATED IN PART, AND REMANDED - 05/05/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This is a suit brought by a mother and her three children against the Roman Catholic Diocese of Jackson,[1] arising out of alleged sexual abuse of the children by George Broussard, then a priest of the Diocese. The merits are not before us today.[2] Rather, the questions presented are whether the First Amendment to the United States Constitution deprives our civil courts of subject matter jurisdiction and whether the trial court erred in ordering the Diocese to answer the plaintiffs' interrogatories and produce documents requests by the plaintiffs.

## FACTUAL BACKGROUND

¶2.     For the limited purpose of deciding the matter before us today, we accept the complaint's factual allegations not in conflict with affidavits (discussed infra) submitted by the Diocese.

¶3.     After moving from Boston to Jackson in 1969, Dr. Francis Morrison, his wife, Dorothy, and their three sons became active parishioners at the Cathedral of St. Peter the Apostle Catholic Church. Then five-year-old Kenneth, seven-year-old Thomas, and ten-year-old Francis, Jr., served as altar boys and were involved in youth activities, including choir. The family developed a friendship with the

---

[1]Other defendants named in the suit have no relevance to the issues we address today.

[2]As noted by the dissent, a statute of limitations problem may indeed exist. However, the issue was neither raised nor briefed by the Diocese in this interlocutory appeal and is therefore not properly before this Court today.

3

priests in the parish, one of whom was Father George Broussard. Over time, Broussard became a close, trusted family friend, who spent much time in the Morrison family's home and at their lakehouse.

¶4.     Shortly after the family started attending St. Peter's, Broussard began to sexually molest the three children at various locations, including the Morrisons' home, their lakehouse, and the church.

¶5.     In 1973, after learning from another parishioner of Broussard's possible sexual molestation of another child at St. Peter's, Dr. Morrison confronted his two oldest children,[3] Thomas and Francis, Jr., both of whom confirmed that they, too, had been sexually molested by Broussard. Dr. Morrison then confronted officials in the Jackson Diocese, including Vicar General Bernard Law, with the allegations of sexual molestation of children by Broussard. When the Diocese officials assured Dr. Morrison that Broussard was receiving treatment for his illness, he "left the matter in the church's hands to determine the best course of action." Other St. Peter's parishioners were not informed by the Diocese of the allegations, and the Diocese allowed Broussard to remain at St. Peter's for over a year, with unrestricted access to the children, during which time Broussard continued to abuse the Morrison boys, although not as frequently.

¶6.     Broussard was then moved to a parish in Waveland, Mississippi, where it is alleged he continued to abuse children. Approximately a year later, he left the priesthood.

¶7.     Dorothy and the three children (the "Morrisons") filed suit in the Circuit Court of the First Judicial District of Hinds County, seeking monetary damages for civil conspiracy; breach of fiduciary

---

[3]According to the complaint, "Dr. Morrison apparently never thought to ask Kenneth about the possibility of abuse; it was years later before Kenneth related the abuse to his family."

4

duty; intentional or negligent infliction of emotional distress; fraud and fraudulent concealment; negligent hiring, assignment and retention; negligent misrepresentation; and negligent supervision. Dorothy asserted a claim for loss of consortium.

¶8. During discovery, the Morrisons propounded certain interrogatories and requests for documents, files and information, regarding other claims and incidents of sexual molestation of children by priests. The Diocese filed written objections to these requests, claiming, inter alia, various privileges. Additionally, the Diocese filed a motion pursuant to Rule 12(b)(1) of the Mississippi Rules of Civil Procedure, seeking dismissal of the lawsuit for lack of subject matter jurisdiction. The Diocese asserted that allowing the Morrisons to pursue their claims in civil court would excessively entangle the court in a thicket of ecclesiastical matters and church policy, thus violate the First Amendment.

¶9. When the Morrisons persisted in demanding the requested discovery, the circuit judge directed the Diocese to produce all requested documents and interrogatory responses to the court for an in-camera inspection. The trial court later denied the motion to dismiss and ordered all documents and interrogatory responses produced to the Morrisons. The Diocese filed petitions seeking interlocutory appeals of both orders. We granted the petitions, see M.R.A.P. 5, and consolidated the appeals.

**ANALYSIS**

¶10. The first question presented is whether the First Amendment deprives our civil courts of subject matter jurisdiction over the causes of action alleged by the Morrisons against a religious institution. Attacks on jurisdiction pursuant to Miss. R. Civ. P. 12(b)(1) are either facial or factual.

5

A facial attack alleges the court lacks jurisdiction as a matter of law, regardless of the determination of factual disputes. A factual attack requires resolution by the trial court of one or more factual disputes in order to determine subject matter jurisdiction.[4] After deciding disputed issues of material fact,[5] the trial court then must accept as true all undisputed well-pled factual allegations of the plaintiff's complaint and proceed to decide the jurisdictional question.

¶11. The language selected by the Diocese for its motion, interlocutory appeal, and brief to the trial court and this Court suggests a facial attack. The Diocese does not advance a detailed factual argument, that is to say, *under the facts of this case*, the court lacks subject matter jurisdiction. Rather, the Diocese says simply that our courts lack subject matter jurisdiction over such causes of action against religious institutions.

¶12. However, in support of its motion, the Diocese submitted the affidavits (the "Affidavits") of Most Reverend (Bishop) William Russell Houck and Most Reverend (Bishop) Joseph Latino. This suggests a factual attack. To fully address the question presented, we shall first analyze the Diocese's motion as a facial attack. We shall then review the Morrisons' causes of action, taking into consideration the Affidavits. We emphasize that this interlocutory appeal does not require us to analyze the merits of the Morrisons' claims. Instead, we address only the jurisdictional issue raised by the Diocese in its motion, which is:

---

[4]For instance, a court deciding a defendant's attack on diversity of citizenship subject matter jurisdiction in a federal court lawsuit filed pursuant to 28 U.S.C. §1332 could be required to decide disputed facts as to the citizenship of the parties.

[5]If necessary, these factual disputes may be revisited by the jury for substantive purposes.

6

Does the First Amendment Doctrine of Church Autonomy preclude the Circuit Court from asserting jurisdiction over claims arising from the manner in which the Catholic Diocese selected, appointed, disciplined, and supervised its clergy?

¶13.    Thereafter, we shall address the discovery issue raised by the Diocese in its motion, which is:

Is discovery of certain documents and the identities of non-party victims/accusers and/or non-party priests precluded by: (a) the First Amendment Doctrine of Church Autonomy, canon law and common law privacy rights of victims and priests, and/or (b) clergy, medical, mental health, attorney, work product, and self-critical analysis privileges?

*Diocese Amici*

¶14.    We were presented and have carefully reviewed an amicus curiae brief filed by The General Council on Finance and Administration of the United Methodist Church, the National Association of Evangelicals, The United States Conference of Catholic Bishops, The International Church of the Foursquare Gospel, The Worldwide Church of God, The Mississippi District of the Church of the Nazarene, The Mississippi District of the United Pentecostal Church International, Rev. Barbara E. Jones, Executive Regional Minister, and Rev. Larry Metzger, Regional Moderator, of the Great River Region of the Christian Church (Disciples of Christ), and Southeastern Synod of the Evangelical Lutheran Church in America ("Diocese Amici").

¶15.    These venerable organizations and individuals urge us to reject the Morrisons' negligence claims which they say seek to make the Diocese liable for all actions of the priest, "wherever and whenever those acts occurred." We disagree with the premise. It is the alleged negligence of the Diocese, not the priest, that the Morrisons complain of here. Furthermore, we are not in a position today to accept or reject the Morrisons' claims. We will only decide whether they may pursue them.

7

¶16.     Diocese Amici further argue that the Morrisons' breach of fiduciary duty claim must fail because it is "based entirely on Defendants' ecclesiastical status or office." However, the Morrisons' complaint alleges much more. It claims that the Diocese promoted a safe atmosphere and gained the trust of the Morrisons with respect to the care of the Morrison children. It further alleges that the resulting relationship of trust was breached by the Diocese when it failed to disclose information concerning sexual abuse by Catholic priests, including Broussard, or otherwise take appropriate steps to protect the children.

¶17.     Additionally, Diocese Amici argue that liability of the Diocese cannot, consistent with the First Amendment, be based on ordination of priests, or on religious speech about a person's fitness to be a minister. This assertion misses the point of the Morrisons' complaint. The Diocese may ordain whomever it concludes is worthy, and it may engage in whatever religious speech it desires. But if it has specific knowledge that children within its care are in danger of sexual molestation, and if it has the authority, power and ability to protect those children from that known danger of abuse and molestation, it is for a jury to determine whether it took reasonable steps to protect the children. By way of illustration, were a hypothetical diocese to allow a hypothetical priest to drive an automobile belonging to the diocese, knowing the priest had taken medication which severely hampered his ability to drive safely, we doubt any serious argument could be made that the diocese was immune from civil liability to an innocent person injured by the priest in an automobile accident. The solution would not require excessive entanglement in ecclesiastical matters or church doctrine. The diocese should simply prevent the priest from driving an automobile under the circumstances. The question presented here

8

is similar. Should our civil courts be allowed to set standards of reasonable conduct within religious organizations for the protection of children from sexual molestation, or would such standards cross the line into ecclesiastical religious matters, thereby offending the First Amendment? The Diocese, and Diocese Amici, urge us to accept that the line would indeed be crossed. They say that claims of negligent assignment, supervision and retention of a priest are either constitutionally barred as applied to churches or, if not barred, are subject to serious constitutional limitations. The dissent accepts this argument by characterizing the Morrisons' claims as arising "from what a bishop says about his priest and from how he supervises or disciplines a priest." However, the Morrisons' claims are more about the duty to protect the children than specific methods employed to supervise priests. We cannot agree that enforcing the duty to protect against sexual molestation of children will excessively entangle the courts in religious matters.

¶18. The arguments of Diocese Amici and the dissent, while well documented and presented, would more appropriately support a motion for summary judgment. The question before us is whether jurisdiction lies. If it does not, Diocese Amici will not need to make the arguments. If it does, the arguments should be made to the trial court.

### I. The Jurisdictional Question

¶19. Our review of relevant state and federal case law cautions us that an analysis of the jurisdictional issue, unless precisely focused, can easily become side-tracked and lost in tangential First Amendment issues neither relevant nor helpful in deciding the matter before us. As stated supra, the question presented is whether First Amendment considerations prevent our civil courts from exercising

9

jurisdiction over the Morrisons' causes of action against the Diocese. These causes of action are civil conspiracy; breach of fiduciary duty; intentional or negligent infliction of emotional distress; fraud and fraudulent concealment; negligent hiring, assignment and retention; negligent misrepresentation; negligent supervision; and loss of consortium.

¶20. Though graced with different labels, each cause of action requires a finding that the Diocese either took action it should not have taken, or failed to take action it should have taken, with respect to Broussard's alleged predilection for sexually molesting children. The Diocese says our civil courts may not inquire into these matters because to do so would require the court to evaluate the relationship between a bishop and his priest; the theological doctrines informing and defining that relationship; and the pronouncements that a bishop made or failed to make about that relationship. And the civil jury would either have to immerse itself in theological criteria to determine the duties of a "reasonable bishop," or in the alternative, define a bishop's duties without regard to whether those duties ran afoul of Church teachings, solemn vows, religious tradition, or canon law.

¶21. Contending that such civil litigation would unnecessarily and excessively entangle our civil courts in religious matters better left to the Church, the Diocese launches three separate (although sometimes commingled) attacks on jurisdiction: The Establishment Clause, the Free Exercise Clause, and the Doctrine of Church Autonomy. In support of these theories, the Diocese provides us with an impressive, well-documented brief, citing much authority and support for its position.

¶22. The Morrisons have also presented an excellent, well-reasoned and persuasive brief which is not without its own impressive support and authority. Indeed, we are quite satisfied that any

10

reasonable research of the issue will yield abundant cases, cites, quotes and authority for the position taken by both the Diocese and the Morrisons, as well as other positions cited by neither.[6]

¶23. The task before us is not discretionary. It is controlled by the United States Constitution and United States Supreme Court decisions which are binding upon us. Stated another way, either the Constitution bars our civil courts from exercising jurisdiction or it does not. If it does, the question is settled, and the claims against the Diocese must be dismissed, despite the fact that the majority of courts addressing the question have allowed such claims to proceed. If it does not, we have no authority to grant any special exemption or immunity to the Diocese, or any other religious organization, for such claims as are raised in this suit, and it must be allowed to proceed, despite the fact that numerous courts have dismissed such claims on constitutional grounds.

¶24. The United States Supreme Court has not addressed the precise issue before this Court. In deciding the question, we turn first to the United States Supreme Court's interpretation of applicable constitutional provisions, followed by a review of applicable decisions from various other courts. These sources reveal that the law provides three basic claims of protection which, under appropriate circumstances, provide a shield to religious organizations[7] from civil claims. We shall review these three theories, seriatim, and apply them to the case before us.

### A. First Amendment Religious Freedom.

---

[6]For state and federal cases tending to lend support for the Diocese's and Morrisons' respective positions, see Appendix A and Appendix B.

[7]These same claims of protection apply, under appropriate circumstances, to individuals engaged in religious activity.

11

¶25. No portion of our federal constitution is more familiar than the First Amendment, a portion of which guarantees our citizens religious freedom.[8] Although their deceptively simple words – "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."[9] – were obviously important to our Founders, it is doubtful they expected the phrase to hatch continual litigation and debate.[10]

¶26. The "Freedom of Religion" portion of the First Amendment includes an "Establishment Clause" and a "Free Exercise Clause," each of which form the basis of a claim of protection by the Diocese. Additionally, the Diocese says the Doctrine of Church Autonomy provides a third basis for its jurisdictional position.

*1. The Establishment Clause*

¶27. The Establishment Clause prohibits government action which tends to endorse, favor or in some manner promote religion. ***Zelman v. Simmons-Harris,*** 536 U.S. 639, 122 S.Ct. 2460, 153 L. Ed. 2d 604 (2002). Writing for the Court in ***Zelman***, Chief Justice Rehnquist, explained the Establishment Clause as follows:

---

[8]The Mississippi Constitution contains similar protections: "no preference shall be given by law to any religious sect or mode of worship; but the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred. The rights hereby secured shall not be construed to justify acts of licentiousness injurious to morals or dangers to the peace and safety of the state...." Miss. Const. art. 3, §18.

[9]U.S. Const. amend. I. Many refer to this portion of the First Amendment as the "Religious Freedom" or "Freedom of Religion" clause.

[10]An Internet search of the term, "religious freedom," yields over eight million results.

12

The Establishment Clause of the First Amendment, applied to the States through the Fourteenth Amendment, prevents a State from enacting laws that have the "purpose" or "effect" of advancing or inhibiting religion. *Agostini v. Felton,* 521 U.S. 203, 222-223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("[W]e continue to ask whether the government acted with the purpose of advancing or inhibiting religion [and] whether the aid has the 'effect' of advancing or inhibiting religion." (citations omitted)).

536 U.S. at 648-49, 122 S.Ct. at 2465.

*Lemon v. Kurtzman*

¶28.    Our current interpretive guidance for an Establishment Clause analysis is ***Lemon v. Kurtzman***, 403 U.S. 602, 91 S. Ct. 2135, 29 L. Ed. 2d 745 (1971), which describes the primary purpose of the Establishment Clause as preventing "sponsorship, financial support, and active involvement of the sovereign in religious activity." ***Id***. at 612 (quoting from ***Waltz v. Tax Comm'n***, 397 U.S. 664, 668, 90 S. Ct. 1409, 25 L. Ed. 697 (1970)).

¶29.    Reliance upon ***Lemon*** for Establishment Clause analysis is unpleasant, but required.  In 1947, the United States Supreme Court first considered the constitutionality of government aid to religious institutions.  In ***Everson v. Board of Education***, 330 U.S. 1, 67 S.Ct. 504, 91 L. Ed. 711(1947), the Court, grounding its newly-discovered constitutional imperative in the words of Thomas Jefferson, stated, "The First Amendment has erected a wall between church and state.  That wall must be kept high and impregnable." ***Id***. at 18.  ***Everson***, and its progeny, led to numerous "separation" cases, *e.g.*, ***Abbington School Dist. v. Schempp***, 374 U.S. 203, 83 S. Ct. 1560, 10 L. Ed 2d 844 (1963) (holding prayer in public schools unconstitutional), and eventually to ***Lemon*** which, although still good

law, enjoys little popularity on the Court and elsewhere.  For instance, Justice Scalia, joined by the

Chief Justice and Justice Thomas, has stated:

> Like a majority of the Members of this Court, I have previously expressed my disapproval of the *Lemon* test. See *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 398-400 (1993) (SCALIA, J., joined by THOMAS, J., concurring in judgment) (other citations omitted).  I would grant certiorari in this case if only to take the opportunity to inter the *Lemon* test once for all.

***Tangipahoa Parish Bd. of Educ. v. Freiler***, 530 U.S. 1251, 1254, 120 S. Ct. 2706, 147 L. Ed.

2d 974 (2000) (Scalia, J., dissenting from denial of certiorari).

¶30.    As stated, however, ***Lemon*** is our current guidance for application of the Establishment

Clause to claims of governmental intrusion into religious territory.  ***Lemon*** provides a three-pronged

test for governmental restrictions on religious activity. To test negative for an Establishment Clause

violation, the governmental action must (1) have a secular purpose; (2) not have the primary effect of

enhancing or inhibiting religion; and (3) avoid excessive entanglement with religion. 403 U.S. at 612-

13.  As to the "excessive entanglement" prong of the ***Lemon*** test, we are provided yet another test

to determine when entanglement becomes excessive; that is, we are instructed to "examine the

character and purposes of the institutions that are benefitted, the nature of the aid that the state

provides, and the resulting relationship between the government and the religious authority." ***Id***. at

615.

¶31.    The governmental intrusion which must be tested in the case sub judice is subjecting the

Diocese to common law causes of action such as negligence, breach of fiduciary duty and fraudulent

concealment, all springing from the Diocese's alleged negligence in hiring and retaining Broussard.

14

Obviously, no one claims these common law causes of action have anything but a "secular purpose," or that they "have the primary effect of enhancing or inhibiting religion." Therefore, having disposed of the first two prongs of the *Lemon* test, we are left with the third, that is to say, we are left to determine whether enforcement of these common law causes of action against the Diocese would result in "excessive entanglement with religion." *Id*. at 612-13. As *Lemon* teaches, we must therefore "examine the character and purposes of the institutions that are benefitted (by those laws), the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Id. at 615.*

¶32. Similarly, the first two prongs of this test (character and purpose of benefitted institutions, and nature of the state aid) are not at issue; instead, it is whether the "resulting relationship between government" and the Diocese creates excessive entanglement. To address this question, we turn to interpretive case law.

### *M.K. v. The Archdiocese of Portland in Oregon*

¶33. As to the Morrisons' vicarious liability, or respondeat superior, theory against the Diocese, we find instructive the analysis of the court in *M.K. v. Archdiocese of Portland in Oregon*, 228 F. Supp. 2d 1168 (D. Or. 2002), which involved a civil suit for sexual battery against the archdiocese arising out of sexual abuse by priests employed by the archdiocese. The court held:

> As with any employer-employee relationship, the parameters of a priest's duties can be discerned by reviewing the "job description" of the priest, in addition to communications between the church and the priest. While this will require the court to consider a number of Defendants' canons delineating the duties of a priest, the court will not need to make any judgment on appropriateness, correctness or validity of any

15

of the canons. The canons will merely define the duties of a priest and the court will then consider whether the Priests' acts of "grooming" fall within this definition. The court will not in any matter limit the priests duties or the ability of the church to supervise the priests.

*Id*. at 1172.

¶34. Thus, the Oregon federal district court concluded that an examination of the duties and responsibilities of the priest would not excessively entangle the court in ecclesiastical matters.

¶35. We hold that the level of authority and control possessed by the Diocese over the actions of its priests belies any notion that the Diocese is immune from any and all claims against it under the theory of vicarious liability. However, having found that claims of vicarious liability against the Diocese are not jurisdictionally prohibited, we do not hesitate to add that any such claim must be carefully analyzed for a determination of whether the particular activity is of such a religious nature as to remove it from examination by the courts. By way of example, we would not hesitate to allow a claim against a religious organization for negligent operation of an automobile by a church employee. The driving of an automobile is not a religious activity. On the other hand, we would not likely allow a claim of vicarious liability against a religious organization for negligent marriage counseling, since the alleged negligence would require a clear understanding of the particular religion's beliefs and practices with respect to marriage.

¶36. The wrongful act alleged in the case sub judice (for purposes of the vicarious liability claim) is sexual molestation of children. There is nothing remotely religious or ecclesiastical about such reprehensible conduct. And since, according to the affidavits, the Diocese enjoyed substantial power

16

and control over the actions of Broussard, we hold the Morrisons are not foreclosed from bringing their claim of vicarious liability against the Diocese because of an absence of subject matter jurisdiction. Whether they will prevail on such theory is a matter for the trial court and/or jury to determine.

*Gibson v. Brewer*

¶37. The Supreme Court of Missouri reached a different result in **Gibson v. Brewer**, 952 S.W.2d 239 (Mo. 1997), in which suit was brought against the diocese and its priests for claims arising out of a priest's improper sexual conduct. Dismissing claims requiring a finding of negligence, the Missouri court stated:

> Questions of hiring, ordaining, and retaining clergy, however, necessarily involve interpretation of religious doctrine, policy, and administration. Such excessive entanglement between church and state has the effect of inhibiting religion, in violation of the First Amendment. *Agostini v. Felton*, 521 U.S. 203, —, 117 S. Ct. 1997, 2015, 138 L. Ed. 2d 391 (1997); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-11, 96 S. Ct. 2372, 2380, 49 L. Ed2d 151, reh. Denied (citation). By the same token, judicial inquiry into hiring, ordaining and retaining clergy would result in an endorsement of religion by approving one model for church hiring, ordination, and retention of clergy. (citations omitted).

952 S.W.2d at 246-47.

*Agostini v. Felton*

¶38. We have carefully reviewed *Agostini* (the primary authority for the Missouri court's holding in **Gibson**), and we find reliance on that case puzzling. It involved nothing remotely connected to "questions of hiring, ordaining, and retaining clergy," as is implied in the Missouri decision. Instead, it addressed the constitutionality of the City of New York Board of Education sending public school

17

teachers into parochial schools to assist disadvantaged children. In overruling ***Aguilar v. Felton***, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), the ***Agostini*** Court held such assistance did not violate the Establishment Clause.

¶39. Rather than supporting the Missouri court's ***Gibson*** decision, ***Agostini*** appears (if anything) to cast doubt on its logic. For instance, on the page from the ***Agostini*** decision cited by the Missouri court (see quote from ***Gibson***, supra), the United States Supreme Court made no mention of hiring, ordaining or retaining clergy, but rather stated:

> Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, see 403 U.S., at 614, 91 S.Ct., at 2112, and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause. See, *e.g., Bowen v. Kendrick,* 487 U.S., at 615-617, 108 S.Ct., at 2577-2579 (no excessive entanglement where government reviews the adolescent counseling program set up by the religious institutions that are grantees, reviews the materials used by such grantees, and monitors the program by periodic visits); *Roemer v. Board of Public Works of Md.,* 426 U.S. 736, 764-765, 96 S.Ct. 2337, 2353-2354, 49 L.Ed.2d 179 (1976) (no excessive entanglement where State conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion).
> * * *
>
> [W]e have not found excessive entanglement in cases in which States imposed far more onerous burdens on religious institutions than the monitoring system at issue here. See *Bowen, supra,* at 615-617, 108 S.Ct., at 2577-2579.

***Agostini***, 521 U.S. at 233-24.

¶40. The Diocese cites ***Ehrens v. Lutheran Church-Missouri Synod***, 269 F. Supp. 2d 328 (S.D.N.Y. 2003), *aff'd*, 385 F.3d 232 (2d Cir. 2004), and other federal district court and state court cases, for the proposition that the Establishment Clause prevents our courts from exercising jurisdiction

over the Morrisons' claims. *See e.g.*, ***Ayon v. Gourley***, 47 F. Supp. 2d 1246 (D. Colo. 1998), *aff'd mem.* 185 F.3d 873 (10th Cir. 1999); ***Swanson v. Roman Catholic Bishop of Portland***, 692 A. 2d 441 (Me. 1997) ***Gibson v. Brewer***, 952 S. W. 2d 239 (Mo. 1997); ***L.L.N. v. Clauder***, 563 N.W. 2d 434 (Wis. 1997); ***Pritzlaff v. Archdiocese of Milwaukee***, 533 N.W. 2d 780 (Wis. 1995).

¶41.    We agree with the Diocese that the decisions of many courts would support dismissal of the Morrisons' complaint on jurisdictional grounds. For instance, in ***Ehrens***, the Federal District Court for the Southern District of New York examined a cause of action for wrongful hiring and retention where the pastor of a Lutheran church was accused of sexually abusing a child. Addressing the jurisdictional issue, the court stated:

> Plaintiff's legal theory is that Defendants employed or supervised or retained Chapman as a Pastor in a position of trust with the knowledge that he had a history of sexually assaulting minors. Plaintiff alleges that in 1977, while serving as Pastor in New York, Chapman was forced to leave that post because of inappropriate behavior towards female members including minors. Reverend Ronald Fink was the President of the Atlantic District in 1977 and is claimed to have had personal knowledge concerning that misconduct. In August 1980, in connection with Chapman's transfer to the New England District, Rev. Fink failed to inform the New England District of Chapman's prior misconduct, and Defendants allowed him to remain rostered, knowing that during his ministry in the New England District, Chapman would have unsupervised access to children, including Plaintiff. This failure is alleged to be the cause of Plaintiff's injuries which are the subject of the suit.

269 F. Supp. 2d at 331-32. The ***Ehrens*** court continued:

> Defendants point out, and this Court agrees that the Court is prevented by the First Amendment to the United States Constitution from determining, after the fact, that the ecclesiastical authorities of the Lutheran Church negligently supervised or retained a clergyman, as Plaintiff contends. It is constitutionally dubious for a court or jury to set

19

a standard of reasonable care for religious bodies which maintain rosters of clergy eligibility for employment by congregations. New York courts have ruled that "any attempt to define the duty of care owed by a member of the clergy to a parishioner fosters excessive entanglement with religion." *Langford v. Roman Catholic Diocese,* 271 A.D.2d 494, 705 N.Y.S.2d 661, 662 (2d Dep't 2000). The same is true with regard to the duty of care in determining the continued eligibility of a priest to serve as a Pastor. As this Court has previously held in *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991) in which Plaintiff's claims against the Church Defendants were dismissed as a matter of law:

> Any inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement .... which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs. Insofar as concerns retention or supervision, the pastor of a Presbyterian Church is not analogous to a common law employee. He may not demit his charge nor be removed by the session, without the consent of the presbytery, functioning essentially as an ecclesiastical court. The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millenia [sic].

269 F. Supp. 2d at 332.

¶42.    We do not find the issue to be as difficult as did the *Ehrens* court. We agree with and support the proposition that the First Amendment deprives our civil courts of jurisdiction over claims which would require "excessive entanglement" of our courts in employment decisions of the Catholic Church.   *See Lemon*, 403 U.S. at 612-13.  However, we find the "excessive entanglement" prong of the *Lemon* test has been unnecessarily expanded and extended by the minority of courts granting First Amendment protection to religious organizations from claims such as those before us today.  A case providing an excellent discussion of excessive entanglement by the government in a religious

20

organization's hiring and retention decisions, is ***Elvig v. Calvin Presbyterian Church***, 375 F.3d 951 (9th Cir. 2004).

*Elvig v. Calvin Presbyterian Church*

¶43.    In ***Elvig***, the pastor of a Presbyterian Church sexually harassed the associate pastor, Monica Elvig, who complained of the inappropriate conduct by her superior to church authorities, who did nothing.  Thereafter, the pastor retaliated against her, prompting her to file a charge of discrimination with the EEOC.  Church officials then terminated Elvig from her employment at the Church and prevented her from seeking employment as a pastor in other Presbyterian churches.

¶44.    Applying the "ministerial exception" to Title VII, the Ninth Circuit refused to allow Elvig to seek damages for either the termination of her employment or her inability to become employed as a pastor at other churches.  However, the court refused to apply the exception to her claim for emotional distress and harm to her reputation caused by the harassment.  The court denied rehearing and rehearing en banc. ***Elvig v. Calvin Presbyterian Church***, 397 F. 3d 790 (9th Cir. 2005).  Four judges explained their reasons for refusing to grant rehearing:

> We declined to allow damages to Elvig for having been terminated, or forhaving been revented from seeking ministerial employment at other churches. We held that those actions came within the ministerial exception to Title VII, and that damages for these actions would have constituted an unconstitutional intrusion into the ministerialrelationship. On the other hand, following *Bollard*, we allowedElvig to seek damages for the sexual harassment and retaliation to which she was subjected:
>
>> [T]he termination of Elvig's ministry and her inability to find other pastoral employment are consequences of protected employment decisions.  Consequently, a damage award based on lost or reduced pay Elvig may have suffered from those employment decisions would

21

necessarily trench on the Church's protected ministerial decisions. The same would be true of emotional distress or reputational damages attributable to those decisions. On the other hand, Elvig may recover for emotional distress and reputational harm caused by the sexual harassment itself— or by retaliatory harassment — because such harassment implicates . . . decisions the ministerial exception does not protect.

*Elvig*, 397 F.3d at 791 (W. Fletcher, J., concurring in denial of rehearing en banc).

¶45.    The plaintiffs' claim of negligent hiring, retention and supervision of Broussard is simply a negligence claim, requiring a finding of duty, breach of duty, causation and damage.  The Diocese, as far as we can tell from the record and briefs before us, does not really contest these traditional elements but, rather, claims they cannot be asserted in a court of law.  For this Court to agree with the Diocese would require us to conclude that ecclesiastical principles could reasonably impose or suggest different requirements for the protection of children from sexual molestation, than the requirements generally imposed by society.  This we cannot do.  The Establishment Clause does not per se prevent civil courts from exercising jurisdiction over such claims.

¶46.    Applying the *Lemon* analysis to the question presented, and finding no persuasive authority to the contrary, we hold that prosecution of the Morrisons' claims will not excessively entangle the court in ecclesiastical matters.  A civil trial may require some inquiry into the relationship between the Diocese and Broussard to learn its nature and extent.  However, the court's inquiry will end at learning whether the Diocese had the authority and power over Broussard to do that which our common law says should have been done, given the extent of knowledge and information available to it.  If it indeed

22

had such power and authority, its requirement to protect children from sexual abuse is not different from other institutions to which the common law applies; no more, no less.

¶47. We emphasize, however, that our holding today does not imply that any of the four requirements for a negligence cause of action have, or have not, been established. We hold only that, if they can be established, they may be pursued in our courts.

### 2. Free Exercise Clause

¶48. It was "historical instances of religious persecution and intolerance" for religious beliefs and practices, that gave birth to the Free Exercise Clause of the First Amendment. ***Church of the Lukumi Babalu Ayae, Inc. v. City of Hialeah***, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993); citing ***Bowen v. Roy***, 476 U.S. 693, 703, 106 S.Ct. 2147, 2154, 90 L. Ed.2d 735 (1986) (other citations omitted). In discussing the Free Exercise Clause, the U.S. Supreme Court stated:

> At a minimum, the protections of the Free Exercise Clause pertain if the law at issue *discriminates* against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons. See, *e.g., Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961) (plurality opinion); *Fowler v. Rhode Island,* 345 U.S. 67, 69-70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953).

***Church of the Lukumi Babalu***,508 U.S. at 532, 113 S. Ct. at 2226 (emphasis added).

### Cantwell v. Connecticut

¶49. The law recognized two manifestations of one's religion, what one believes, and what one does when acting on those beliefs. This truth was addressed in ***Cantwell v. Connecticut***, 310 U.S. 296,

23

60 S. Ct. 900, 84 L. Ed. 1213 (1940), which held that the Free Exercise Clause guaranteed two separate concepts of freedom: the freedom to believe, and the freedom to act. In elaborating, it further held that "the first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Id*. at 303-04 (emphasis added). Since *Cantwell*, courts have struggled to mark a line defining where government may begin, "for the protection of society," to regulate religious conduct.

*Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*

¶50. Twelve years following *Cantwell*, the Court decided *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952), which involved a dispute over control of the New York churches of the Russian Orthodox religion. The Court of Appeals of New York decided the dispute by applying a New York statute to transfer control from the Patriarch of Moscow and the Holy Synod, to the governing authorities of the church in America. In reversing, the United States Supreme Court held that the statute "directly prohibit[ed] the free exercise of a ecclesiastical right, the Church's choice of its hierarchy." The Court went on to state:

> Ours is a government which by the law of its being allows no statute, state or national, that prohibits the free exercise of religion. There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion.

344 U.S. at 120-21 (footnotes omitted).

24

*Wisconsin v. Yoder*

¶51.    The test for violation of the Free Exercise Clause was next refined in a case involving three families from Green County, Wisconsin, all members of the Amish faith who, for religious reasons, refused to comply with a Wisconsin statute which required them to send their children to public high school.

¶52.    In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), the United States Supreme Court recognized that a State has a high responsibility for educating its citizens, and therefore could certainly "impose reasonable regulations for the control and duration of basic education." 406 U.S. at 213.  However, the *Yoder* Court recognized that "a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest [11] of parents with respect to the religious upbringing of their children...." *Id*. at 214.

¶53.    In deciding the case in favor of the Amish families, the Court set as a requirement to overcome the State's interest in enforcing laws not specifically aimed at religion, a finding that the refusal be "rooted in religious belief." *Id.* at 216.  The Court conducted an extended evaluation of the quality

---

[11]This "traditional interest" of parents assumes considerable significance in later cases. *See, e.g, Employment Div. Dep't. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), discussed infra.

of the Amish families' claim that sending their children to public high school would violate their religious beliefs.

*Employment Division Department of Human Resources of Oregon v. Smith*

¶54. The United States Supreme Court shifted its concentration from the quality of the religious belief to the nature of the restriction in ***Employment Division Department of Human Resources of Oregon v. Smith***, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).[12] In that case, members of the Native American Church were denied employment benefits after being discharged from employment for ingesting the hallucinogenic drug, peyote, which was in violation of Oregon law. The Court began its analysis by recognizing that the Free Exercise Clause would prohibit any statute or law from banning religious practices "only when they are engaged in for religious reasons, or only because of the religious belief that they display." 494 U.S. at 877. The same cannot be said, however, where the statute or law "is not specifically directed at [the] religious practice," and the law or statute is constitutional as applied to non-religious conduct. *Id*. at 878. The Court then provided the following guidance which is of great assistance in reaching our decision in the case sub judice:

> They contend that their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practice, and that is concededly constitutional as applied to those who use the drug for other reasons. They assert, in other words, that "prohibiting the free exercise [of religion]"

---

[12]The Court had previously vacated and remanded the case for a determination of whether religious use of peyote was legal in Oregon. ***Employment Div. Dep't. of Human Res. of Oregon v. Smith***, 485 U.S. 660, 108 S. Ct. 1440, 99 L. Ed. 2d 753 (1988). The Oregon Supreme Court responded that sacramental use of peyote was illegal in Oregon. ***Employment Div. Dep't of Human Res. of Oregon v. Smith***, 307 Or. 68, 763 P.2d 146 (1988).

includes requiring any individual to observe a generally applicable law that requires (or forbids) the performance of an act that his religious belief forbids (or requires). As a textual matter, we do not think the words must be given that meaning. It is no more necessary to regard the collection of a general tax, for example, as "prohibiting the free exercise [of religion]" by those citizens who believe support of organized government to be sinful, than it is to regard the same tax as "abridging the freedom . . . of the press" of those publishing companies that must pay the tax as a condition of staying in business. It is a permissible reading of the text, in the one case as in the other, to say that if prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended. (citations omitted)

Our decisions reveal that the latter reading is the correct one. We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As described succinctly by Justice Frankfurter in *Minersville School Dist. Bd of Ed. v. Gobitis,* 310 U.S. 586, 594-595, 60 S.Ct. 1010, 1012-1013, 84 L.Ed. 1375 (1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted).

494 U.S. at 878-79.

¶55. The Court did, of course, refuse to apply Wisconsin's generally applicable statute requiring school attendance to Amish children on religious grounds. (See discussion of **Yoder**, supra. This seeming conflict is resolved to the **Employment Division** Court's satisfaction by its pointing out:

The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivate action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press . . . (citations omitted), or the right of parents, acknowledged in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), to direct the education of their

27

children, see Wisconsin v. Yoder, (citation omitted) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).

*Employment Division*, 494 U.S. at 881. The previous quoted language from *Employment Division* is footnoted with the following:

> *Yoder* said that the "the Court's holding in *Pierce* stands as a charter to the rights of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment. 406 U.S., at 233, 92 S. Ct., at 1542.

*Employment Division*, 494 U.S. at 882 n.1.

¶56. The respondents in *Employment Division* urged the Court to accept that regulation of their conduct would also serve to regulate their religious convictions.[13] The Court rejected this contention, stating, "We have never held that, and decline to do so now. There being no contention that Oregon's drug law represents an attempt to regulate religious beliefs, the communication of religious beliefs, or the raising of one's children in those beliefs, the rule to which we have adhered ever since *Reynolds* plainly controls." 494 U.S. at 882.

¶57. The Diocese in the case sub judice would have us accept that subjecting it to prosecution of civil claims for negligent supervision would be tantamount to attempting to regulate its ecclesiastical policies, principles and procedures. However, as in *Employment Division*, there is no contention that Mississippi's tort law represents an attempt to regulate the ecclesiastical beliefs, policies or

---

[13]As stated in *Cantwell*, supra, the government may never regulate religious thought.

28

principles held by the Diocese, or the communication of those beliefs, policies or principles, or the training and nurturing of priests in those beliefs, policies or principles.

¶58.    We read **Employment Division** to hold that valid, neutral laws which regulate conduct the State is free to regulate will be upheld against all institutions, including those of a religious nature.

   *Church of the Lukumi Babalu Ayae, Inc. v. City of Hialeah*

¶59.    Elaboration on the holding **Employment Division** is provided in **Lukumi**, 508 U.S. at 531, which instructs that we must inquire whether this restriction is neutral "both on its face and in its purpose." If it is not found to be neutral, but rather is aimed at religious conduct, there is additional analysis required. *See, e.g.*, *id*. at 533. However, such analysis is not required here, since there is no allegation that any of the laws in issue here are narrowly aimed at religious conduct rather than generally applied.

   *Malicki v. Doe*

¶60.    Finally, with respect to our Free Exercise Clause analysis, we review the Florida Supreme Court's recent decision of **Malicki v. Doe**, 814 So. 2d 347 (Fla. 2002), which involved a suit against the Archdiocese of Miami for negligent hiring and supervision of a priest accused of sexually molesting both a minor and adult parishioner. We find the Florida court's analysis compelling:[14]

> In this case, the Church Defendants do not claim that the underlying acts of its priest in committing sexual assault and battery was governed by sincerely held religious

---

[14]For a thorough discussion of **Malicki** which concludes with a point of view different from that which we hold, see Lisa J. Kelty, *Milicki v. Doe, The Constitutionality of Negligent Hiring and Supervision Claims*, 69 Brooklyn L. Rev. 1121 (2004).

beliefs or practices. Nor do they claim that the reason they failed to exercise control over Malicki was because of sincerely held religious beliefs or practices. Therefore, it appears that the Free Exercise Clause is not implicated in this case because the conduct sought to be regulated; that is, the Church Defendants' alleged negligence in hiring and supervision is not rooted in religious belief. Moreover, even assuming an "incidental effect of burdening a particular religious practice," the parishioners' cause of action for negligent hiring and supervision is not barred because it is based on neutral application of principles of tort law.

Through neutral application of principles of tort law, we thus give no greater or lesser deference to tortuous conduct committed on third parties by religious organizations than we do to tortuous conduct committed on third parties by non-religious entities. For example, Florida courts, as well as courts in other jurisdictions, have applied neutral principles of tort law to religious institutions in premises liability cases.

*Id*. at 360-61 (footnotes & citation omitted).

*Bear Valley Church of Christ v. DeBose*

¶61.   The *Malicki* court cited with approval *Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315, 1323 (Colo. 1996), which held that the First Amendment was not a bar to tort claims made by a child against a pastor and church for a "pattern of inappropriate touching" in counseling sessions. The Colorado Supreme Court, responding to the argument that allowing a negligent hiring claim would necessarily entangle the court in ecclesiastical matters, held:

> While claims for illegal hiring or discharge of a minister inevitably involve religious doctrine, that is not the case for a claim of negligent hiring of a minister. The claim of negligent hiring is brought after the employee has harmed a third party through his or her office of employment. An employer is found liable for negligent hiring if, at the time of hiring, the employer had *reason to believe that hiring this person would create an undue risk of harm to others*. Hence, the court does not inquire into the employer's broad reasons for choosing this particular employee for the position, but instead looks to whether the specific danger which ultimately manifested itself could have reasonably been foreseen at the time of hiring.

30

*Id*. at 1323 (citations omitted) (quoting ***Van Osdol v. Vogt***, 908 P.2d 1122, 1132 n. 17)(Colo. 1996)(emphasis added).

¶62.    Applying the teachings of ***Employment Division*** and ***Lukumi***, as did the Florida Supreme Court, we are persuaded that the tort laws of Mississippi are valid, neutral laws which regulate conduct the State is free to regulate, and such laws must be upheld against all institutions, including the Diocese.  We thus find no merit to the assertion that the Free Exercise Clause deprives our civil courts of jurisdiction over the causes of action alleged in the Morrisons' complaint against the Diocese.

        *3. The Doctrine of Church Autonomy*

¶63.    The third theory presented to us by the Diocese is the Doctrine of Church Autonomy, sometimes referred to as the Ecclesiastical Abstention Doctrine.

¶64.    In 1872, the United States Supreme Court decided ***Watson v. Jones***, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1872), which involved a bitter property dispute between pro-slavery and anti-slavery factions within the Presbyterian Church at the conclusion of the Civil War.  The matter was submitted to, and decided by, the highest Presbyterian church authorities, whose decision was reversed by the Kentucky Court of Appeals.  The Kentucky court applied an English precedent known as Lord Eldon's Rule, which provided that church disputes should be submitted to civil courts, and decided in favor of the faction which most closely followed traditional doctrine.  ***Watson***, 80 U.S. (13 Wall.) at 727.

¶65.    In rejecting Lord Eldon's Rule and reversing the Kentucky court, the ***Watson*** Court, found civil courts to be "incompetent judges of matters of faith, discipline, and doctrine." Thus, held ***Watson***,

31

civil courts must[15] decline jurisdiction over such matters. *Id*. at 732. The *Watson* Court went further

to hold:

> Each [church] has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitutes a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own.

*Id*. at 729.

¶66.    In addition to finding church authority better able to decide such disputes within the church,

the *Watson* Court eschewed the prospect of civil courts examining "with minuteness and care" not

only the "subject of doctrinal theology," but also "the usages and customs, the written laws, and

fundamental organization of every religious denomination." *Id*. at 733.

---

[15]In characterizing the rule announced in *Watson* as "constitutional protection," the U.S. Supreme Court was later to say in *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952), that the *Watson* decision radiates

> a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy . . . must now be said to have federal constitutional protection . . . against state interference.

344 U.S. at 116.

¶67.   The rule announced in *Watson* is not without precedent in Mississippi.   In *Sustar v. Williams*, 263 So. 2d 537 (Miss. 1972), this Court followed the *Watson* rule, holding that "Mississippi courts accept the highest ecclesiastical authority in each church as being the faith and practice of that church."   *Id*. at 540.   *See also* **Mt. Helm Baptist Church v. Jones** 79 Miss. 488, 30 So. 714, 716 (1901) ("This court exercises no ecclesiastical jurisdiction.   It accepts what the highest ecclesiastical authority in each church promulgates as the faith and practice of that church.").

¶68.   *Watson* is cited by the Diocese as the origin of, and authority for, the Doctrine of Church Autonomy.[16]   This Doctrine, later found to be a constitutional imperative in *Kedroff*, is strongly advanced by the Diocese, whose arguments suggest bright-line abstention by civil courts in virtually all matters and disputes arising within the church.   The Diocese cites over one hundred cases in its brief, providing numerous examples of governmental and judicial abstention in cases involving various kinds of disputes within religious organizations.   However, we do not read any of these cases to say, and we are not so easily persuaded, that the Doctrine of Church Autonomy suggests blanket protection of the Church from all accountability in our civil courts.   As with everything judicial, there are exceptions, tests, and limits.

---

[16]When *Watson* was decided in 1872, the First Amendment had not been applied to state action through the Fourteenth Amendment.   And because *Watson* pre-dated *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), Kentucky law was not applied to this diversity case, as it would have been following *Erie*. *See Kedroff*, 344 U.S. at 115-16.

33

¶69.  We read *Watson* to hold only that civil courts may not take jurisdiction over a religious organization's internal, ecclesiastical matters.  We do not read it to expand the scope of what are a religious organization's internal, ecclesiastical matters.  Rather, we are persuaded by the following language from *Watson*:

> When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide.  But the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them.

*Watson*, 80 U.S. (13 Wall.) at 731 (*citing with approval* **Harmon v. Dreher**, 2 Speer's Equity, 87.

*Ministerial Exception to Title VII*

¶70.  Much of the authority cited to us by the parties, as well as others we have reviewed, were decided under traditional First Amendment analysis, applying either the Establishment Clause or the Free Exercise Clause, or both.  Nevertheless, there are still valid judicial applications of the *Watson* Doctrine of Church Autonomy.  For instance, the Catholic Church only allows men to be priests.  Such policy would not long survive a Title VII challenge in the secular world.  However, Title VII recognized an unwritten "ministerial exception" which places this Catholic policy outside the reach of civil courts.  *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955-57 (9th Cir. 2004);. *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 945 (9th Cir. 1999).[17]

---

[17]**Bollard** and **Elvig** are fully discussed supra.

34

¶71.    In addition to *Watson*, we note that in cases addressing internal disputes over church

property, courts have generally applied the Doctrine of Church Autonomy (although

sometimes by another name), citing *Watson* and "the First and Fourteenth Amendments." For

instance, *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S. Ct. 2372, 49

L. Ed. 2d 151 (1976), involved the defrocking of a diocesan bishop who controlled the monastery,

and who was the principal officer of the corporation holding the property. The bishop and others sued

in the Illinois Circuit Court, seeking to reverse the church's internal decision to defrock, and to split

up the church and its property into three dioceses. The Illinois Supreme Court held the church's

actions were procedurally and substantively defective and arbitrary. 426 U.S. at 698. In reversing

the Illinois court, the United States Supreme Court stated, "It suffices to note that the reorganization

of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical

affairs." *Id*. at 721. The Court then cited *Watson* for the proposition that legal tribunals must accept

the decision of the highest church authorities which have decided "questions of discipline, or of faith,

or ecclesiastical rule, custom, or law." *Id*. at 696.

¶72.    The attempted application of *Watson* to secular disputes (as opposed to internal, ecclesiastical

disputes) involving a church was discussed in *General Council on Fin. And Admin. of the*

*United Methodist Church v. Superior Court,* 439 U.S. 1355, 99 S. Ct. 35, 58 L. Ed. 2d 63

(1998), wherein Justice Rehnquist[18] stated:

---

[18]Justice Rehnquist, sitting as a Circuit Justice, rendered this "in chambers" opinion which is not binding upon the Supreme Court, but is helpful and instructive.

35

There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes. (citation omitted). **But this Court never has suggested that those constraints similarly apply outside the context of such intraorganization disputes**. Thus, *Serbian Eastern Orthodox Diocese* and the other cases cited by applicant are not in point. Those cases are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. (citation omitted). **Such considerations are not applicable to purely secular disputes** between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract and statutory violations are alleged. As the Court stated in another context, "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public." *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S. Ct. 900, 904, 84 L. Ed. 1213 (1940).

439 U.S. at 1372-73 (emphasis added).

*Morrison Amici*

¶73. We have been presented an excellent amicus curiae brief by The Survivors Network of Those Abused by Priests, and SNAP Mississippi ("Morrison Amici"). The argument presented is that the United States Supreme Court decisions in *Employment Division*, *Milivojevich*, and *Kedroff*, as well as other lower-court cases, stand only for the proposition that "churches have the right to define and govern their theology, their membership, and their own tribunal's ecclesiastical determinations." This case, they say, does not place that right in danger. Additionally, they advance the argument that, "[w]hile the Free Exercise Clause protects a Church from *persecution* for its beliefs, (citing *Church of Lukumi Babalu Aye*), it is no defense to a lawsuit brought pursuant to neutral laws of general applicability like those at issue in this case. (citations omitted)." (emphasis in original). We agree.

36

¶74.    We are satisfied that the cloak of religion, which does not shield religious institutions from civil responsibility for fraud or breach of contract, surely cannot serve to shield such institutions from civil responsibility for more abhorrent conduct such as sexual molestation of a child. Nor should it shield those who fail in their duty to protect children from it.

**B. Causes of Action.**

¶75.    We turn now to the causes of action alleged by the Morrisons. In its penultimate sentence, the dissent attempts to characterize all of the Morrisons' claims as "clergy malpractice." We cannot agree. We find this case to be no more about clergy malpractice that a suit by a client against a lawyer for assault would be about legal malpractice. The term "malpractice" involves "[a]n instance of negligence or incompetence on the part of a professional." Black's Law Dictionary 777 (7[h] ed. 2000). The term "legal malpractice" involves the "failure to render professional services with the skill, prudence, and diligence that an ordinary and reasonable lawyer would use under similar circumstances." *Id*. This case involves no claim that Broussard was negligent or incompetent in the rendering of religious services or priestly advice. In fact, many of the instances of molestation are alleged to have taken place at the Morrisons' home and lake house, unrelated to any church activity.

¶76.    The facts we assume to be true (for our purposes today) are those facts alleged in the Morrisons' well pled complaint, together with the facts alleged in the affidavits of Bishop Houck and Bishop Latino. These affidavits essentially tell us:

> (1)    Subject to the books of the Old and New Testament, "from which is derived the whole juridical-legislative tradition of the Church. . . ," the "Code of Canon Law is the universal law of the Roman Catholic Church."

37

(2)   "There can never be a circumstance in which a priest's sexual contact with another would constitute activity withing the course or scope of his ministry, his work, or his service to the Church."

(3)   A Bishop's "ministry of governance" is led by the Holy Spirit.

¶77.   As concerns the question presented, the crux of the affidavits, taken together, is well stated in the affidavit of Bishop Houck:

> A bishop's decisions regarding ordination, appointments, assignments, re-assignments, discipline, and laicization of priests are likewise made prayerfully and in this full context of striving to imitate the Good Shepherd, as that vocation is understood within the Roman Catholic Church. Accordingly, a bishop's interactions with the priests under his care are only properly understood as part of the bishop's ministry as Christ to the Church. A bishop's conversations with his priests, regardless of whether they take place in the contest of the bishop as spiritual advisor, pastorial counselor, ecclesiastical authority, or brotherly priest, reside within this theological framework.

¶78.   Bishop Houck further states that the Diocese of Jackson is under the legislative, executive and judicial control of the Bishop of the Diocese. He further tells us that a bishop is "pastor, spiritual adviser, pastoral counselor, spiritual mentor, ecclesiastical authority, father and brother" of a priest. He then reminds us that the employment practices of the Catholic Church are "not subject to employment laws in the manner that secular employers are subject to employment laws. . . . It may exclude candidates for ordination and assignment based upon gender, age, and disability in a manner that would not be allowed to secular employers."

¶79.   Bishop Houck adds, "When a bishop assesses whether to discipline or remove a priest from the office assigned to him, he must determine and obey the wisdom and demands of the Scriptures, the teachings of the Church, and the requirements of the Code [of Canon Law]."

38

¶80.    Finally, in explaining the difficulty involved in disciplining a priest who has committed a prior failing, Bishop Houck states:

> One of the difficulties in ascertaining whether a man has been called as a priest is that, for the Church, a prior failing, while a cause for inquiry and concern, is not necessarily a disqualification for ministry.  The Church believes that genuine conversion can occur.  Thus, depending upon the circumstances, a prior failing may have taught a spiritual lesson which the individual can share with others in his ministry, as for example in the lives of Moses and King David.  See, e.g, Exodus 2:11-15 (Moses' murder of the Egyptian, hiding the body, and fleeing as a fugitive), II Samuel 11:2-12:15 (David's adultery with Bathsheba and coverup by killing her husband), Psalm 51 (David's "Miserere" psalm of contrition, forgiveness, and grace).

¶81.    Because the affidavits are not rebutted in the record, we accept all statements therein as true.  We now apply these statements, together with the Morrisons' factual allegations, to the causes of action alleged in the complaint.

*1. Breach of Fiduciary Duty*

¶82.    In discussing the principle of fiduciary duty, this Court has held:

> It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal. (If a relation of trust and confidence exists between the parties--that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused--that is sufficient as a predicate for relief. The origin of the confidence is immaterial.).

*Glenn v. Macon*, 249 Miss. 493, 514, 163 So. 2d 239, 249 (1964).  Thus, a fiduciary duty exists where one person or institution assumes a trust relationship with another, such that the former, as a matter of choice or legal obligation,  assumes the responsibility to act in the best interest of the latter,

39

even to the detriment and peril of the best interests of the former. As stated in another of this Court's decisions, a fiduciary duty may exist when there is a relationship wherein one person is in a position to exercise a dominant influence upon another, arising either from weakness of mind or body, or through trust. *Mullins v. Ratcliff*, 515 So. 2d 1183, 1191 (Miss. 1987). "A confidential relationship such as would impose the duties of a fiduciary does not have to be a legal one, but may be moral, domestic or personal." *Id*.

¶83.    This Court recently examined the suit of a parishioner against her priest and her diocese in *Mabus v. St. James Episcopal Church*, 884 So. 2d 747 Miss. 2004), wherein the priest was involved in a secretly taped conversation between the parishioner and her husband. We held that "a priest may not be held to be in a fiduciary relationship *merely based upon his status as a priest*." *Id*. at 760 (emphasis added). However, we also held, without dissent, that "the claim for breach of fiduciary duty [was] not prohibited by the First Amendment." *Id*. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999) (First Amendment no bar to claim of breach of fiduciary duty for sexual abuse by priest); *Moses v. Diocese of Colorado*, 863 P.2d 310, 314 (Colo. 1993) (same); *F.G. v. MacDonell*, 150 N.J. 550, 696 A.2d 697, 702-03 (1997) (same).

¶84.    The Diocese argues that the breach of fiduciary duty claim is no more than an action for clergy malpractice. However, *Mabus* established that an action for breach of fiduciary duty is distinguishable from an action for clergy malpractice. "Whether a fiduciary relationship exists depends on factual

40

circumstances, not upon professional standards of conduct for a reasonable member of the clergy."
*Mabus*, 884 So. 2d at 757 (citing ***Doe v. Hartz***, 52 F. Supp. 2d 1027, 1062 (N.D. Iowa 1999)).

¶85.    Here, the affidavits submitted by the Diocese address almost exclusively the relationship between the Diocese and the priest. We are told little about the relationship between the Diocese and the parishioner. The affidavits do make clear, however, that the Diocese had the power and authority to remove Broussard from his position at the Church. Whether the Diocese had sufficient knowledge and information to obligate it to refuse to hire and/or retain Broussard is a question of fact to be decided at trial. Even if such knowledge and information was possessed by the Diocese, the Morrisons still must bear the burden of proving sufficient facts to establish that the Diocese had a fiduciary duty to act.

¶86.    We are not prepared to say that our courts are without jurisdiction over the Morrisons' claim against the Diocese for breach of fiduciary duty. Following the teaching of *Mabus*, we hold as a matter of law that a fiduciary duty did not exist merely because Broussard was the Morrisons' priest. However, it may have existed for other reasons. That question is not before us today, and we therefore affirm the decision of the trial court in refusing to dismiss the Morrisons' breach of fiduciary claim on jurisdictional grounds.

### 2. Fraud, Fraudulent Concealment and Conspiracy to Conceal

¶87.    The Morrisons allege that the Diocese acted to fraudulently conceal their knowledge of illegal sexual abuse of children. In *Mabus*, this Court held that the plaintiff could proceed with her fraudulent concealment claim against her priest, but held that she could not proceed with her vicarious

41

liability claim against the Diocese because neither the Church nor the Diocese authorized or ratified the Priest's actions of fraudulent concealment. *Id*. at 763. We are not prepared today to say the same is true here.

¶88. The Affidavits do not address the specific facts surrounding the alleged sexual abuse of the Morrison children. We do not know whether the Diocese authorized or ratified Broussard's actions, nor do we know whether it took action to cover it up. Those questions are simply not before us today. We have been asked only to review the jurisdictional issue.

¶89. In *Mabus*, we did not hold that the circuit court lacked jurisdiction, and we do not so hold today. As the Supreme Court stated in *Cantwell*, 310 U.S. at 303, freedom to believe is absolute, but freedom to act cannot be. A church may not hide behind the first amendment when perpetrating fraud upon the public or its members. As stated in *General Council*, 439 U.S. at 1373, "in resolving intrachurch disputes the State will become entangled in essentially religious controversies . . . [however] [s]uch considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which *fraud*, breach of contract, and statutory violations are alleged.") (emphasis added). "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes conduct that his religion prescribes." *Employment Div.*, 494 U.S. at 879. Furthermore, "Laws . . . are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." *Id.*

42

¶90.    We hold that the doors of the circuit court are not jurisdictionally locked to the Morrisons' claims of fraud, fraudulent concealment and conspiracy.

> *3. Negligence Causes of Action.*

¶91.    In *Mabus*, we upheld the trial court's grant of summary judgment on several negligence causes of action. *Mabus* was a review of a trial court's grant of summary judgment, rather than (as here) a challenge to subject matter jurisdiction. However, had *Mabus* been framed in terms of a jurisdictional challenge, it would have been a factual rather facial challenge.

¶92.    We held in *Mabus* that allowing the case to go forward would "excessively entangle this Court into the investigation and evaluation of religious tenets." *Id*. at 764. That determination was made based upon the record of facts before us, rather than a blanket determination that our circuit court lacked jurisdiction. Our holding on the negligence claims in *Mabus* was limited to its facts. This Court has never held that, as a jurisdictional matter, religious institutions may not ever be held liable in our civil courts for their active negligence. Our decision in *Mabus* was motivated by the record presented to us, not by an absence of subject matter jurisdiction.

¶93.    By contrast, we are here concerned with the duty imposed by the common law to protect against the foreseeable harm to children caused by sexual molestation. Regardless of what policies or practices may have been adopted by the Diocese, it may be held liable for negligence if the Morrisons can establish: (1) the Diocese – because of specific knowledge or information available to it – knew (or should have known) that the Morrison children were in danger of sexual molestation by Broussard; (2) the Diocese had the power and authority to prevent the sexual molestation of the

43

children, but did not do so; (3) a reasonable, prudent person would have prevented the sexual molestation; and (4) as a proximate result, the Morrisons suffered damage.

¶94. This Court held in *Summers ex rel. Dawson v. St Andrew's Episcopal School*, *Inc.,* 759 So. 2d 1203, 1213 (Miss. 2000), that, "[t]he school is not an insurer of the safety of pupils, but has the duty of exercising ordinary care, of reasonable prudence, or of acting as a reasonable person would act under similar circumstances." This court also stated that, "schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students, thereby providing a safe school environment." *Id*.

¶95. In *Mabus*, we observed, "with the exception of the claim for negligent supervision and retention, [the plaintiff] seeks to impose vicarious liability on the Church and Diocese for the actions of [the priest]." *Id*. at 756. We continue to state that our holding in *Mabus* is sound. Churches and religious institutions are not traditional employers such that vicarious liability, through the doctrine of respondeat superior, exists as a matter of law, in all cases. The relationship between a religious organization and its leader – such as pastor, preacher, rabbi or priest – is not the same for every religion. While on the one hand, the authorities in the centralized associations (e.g. the Southern Baptist Convention) may have no power or authority over its autonomous local congregations,[19] the Pope, Cardinals and diocese may have considerable power and influence over a local Catholic

---

[19]*See **Pilgrim Rest Missionary Baptist Church v. Wallace***, 835 So. 2d 67, 71 (Miss. 2003) citing *Allen v. Roby*, 109 Miss. 107, 67 So. 899, 900 (1915) ("[e]ach church is a distinct organization, independent of others").

congregation. Such relationships come in many varieties, church to church, and are *by definition* of a religious nature, determined primarily by the religious beliefs and ecclesiastical doctrine of the particular religious group.

¶96.    Nevertheless, as discussed supra, under certain factual circumstance, churches and religious institutions may be held vicariously liable for the actions of pastors and other employees. These determinations require a factual analysis and are not decided on jurisdictional grounds.

¶97.    We will not today pass on the legitimacy of the Morrisons' vicarious or direct negligence claims. But we do hold that they are not jurisdictionally barred. To hold otherwise, that is, to hold that the Diocese is immune and completely insulated from claims that it committed negligent acts which caused damage to third parties, would be contrary to the holdings in *Lemon v. Kurtzman*; *Church of the Lukumi Babalu Ayae, Inc. v. City of Hialeah*; *Bowen v. Roy, Cantwell v. Connecticut*; *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*; *Employment Division Department of Human Resources of Oregon v. Smith*; and *Watson v. Jones*.

¶98.    We accept that our civil courts should not take jurisdiction over matters which "foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. at 613 (citation omitted). For instance, our civil courts may not resolve disputes of scriptural interpretation or denial of membership in a particular congregation.[20] But we reject the notion that the First Amendment

---

[20]Although our courts may not question the "propriety or justification for dismissing a pastor," they nevertheless may, in appropriate circumstances, exercise jurisdiction to order that the vote take

45

provides, or was intended to provide, blanket civil immunity to churches for violation of recognized standards of conduct which results in reasonably foreseeable harm.

¶99. We further state that our holding today is not to be blindly applied, allowing in all cases the exercise of jurisdiction over a particular cause of action. Rather, each cause of action asserted against a religious organization claiming First Amendment protection, must be evaluated according to its particular facts. For instance, with respect to a claim of breach of fiduciary duty, a religious organization might enjoy First Amendment protection from claims of failure to provide a certain quantity or quality of religious instruction in exchange for tithes and offerings, but might not enjoy such protection from claims that it solicited and accepted funds to be held in trust for a specific, stated purpose, but spent the funds for an unauthorized purpose.

¶100. We hold that the Morrisons are not jurisdictionally barred from presenting their negligence claims in circuit court.

### 4. Intentional Infliction of Emotional Distress

¶101. Having found that our courts are not jurisdictionally barred from hearing the Morrisons' negligence claims, we hold the same reasoning applies, even more so, to claims of intentional torts. Therefore, the Morrisons are not barred from presenting their claim for intentional infliction of emotional distress in circuit court. *See* ***Gibson v. Brewer***, 952 S.W. 2d 239, 249 (Mo. 1997) ("liability for intentional torts can be imposed without excessively delving into religious doctrine, polity,

---

place. ***Pilgrim Rest Missionary Baptist Church v. Wallace***, 835 So. 2d at 71.

and practice"). Furthermore, "[r]eligious conduct intended or certain to cause harm need not be tolerated under the First Amendment." *Id.* at 248 (citing *Cantwell*, 310 U.S. at 308.))

### 5. *Loss of Consortium.*

¶102. Dorothy Morrison, the mother of the three Morrison children who allege they were sexually molested by Broussard, makes a claim for loss of consortium. Her claim is challenged only on jurisdictional grounds, and we hold her claim is not jurisdictionally barred. Any claim challenging the cause of action on other grounds will be reviewed by this Court only after the challenge has been presented to the trial court for determination.

### II. The Discovery Question

¶103. We turn now to the second issue raised by the Diocese concerning discovery disputes. The Morrisons served discovery upon the Diocese, including the following:

*Interrogatories*

Identify every attorney consulted since 1965 relating to any allegations of inappropriate conduct by a priest toward a minor;

itemize any and all reports or complaints made to the Diocese, at any time, which alleged any inappropriate conduct by Broussard towards any minor child;

identify when you first received any information concerning any allegations involving Broussard and alleged inappropriate behavior towards minor children;

identify any and all persons with whom the Diocese or its representatives have negotiated any kind of settlement arrangement or agreement or other arrangement or agreement as a result of allegations of abuse by Broussard;

identify every document of which you know, or about which you have information, which relates in any way to any allegation of abuse by Broussard of any minor;

47

identify any and all priests about whom allegations of sexual abuse have been made known to any church officials in the Jackson Diocese.

*Requests for Production of Documents*

Any and all documents or things received by you from any individual or on behalf of any individual who has ever made any allegations of inappropriate behavior by any priest relating to any minor (including plaintiffs);

all confidential files relating to allegations of child abuse by any priest ever employed in Mississippi;

produce all documentation in your possession or control relating to allegations of inappropriate conduct towards children by Broussard.

¶104. In response to these requests, the Diocese raised numerous objections and privileges. The initial response to each of the nine requests for which the trial court ordered supplemental answers, includes some portion or variation of the following language:

Objection on grounds that the request is overly broad, unduly burdensome, and beyond the scope of MRCP 26(b). The request seeks information of a highly sensitive private and personal nature which Defendant objects to disclosing without the consent of the person(s) involved and/or entry of an appropriate protective order. The request may encompass materials protected against disclosure by Defendant for work product, attorney-client privilege, priest-penitent privilege, and/or sacramental seal of confession of Catholic Church. Further, results of the Diocese's Fitness Review Administrator and/or Investigating Committee are confidential.

¶105. The Diocese also claims that various privileges apply to the requested responses and documents, including Physician/Psychotherapist-Patient, Self-Critical Analysis, Priest-Penitent, Attorney-Client, Work Product, and First Amendment. Also, the Diocese claims it is privileged from violation of privacy rights arising from Canon law.

48

¶106. We will analyze each of the asserted privileges. Each of the requested documents and interrogatory answers falls into one of three categories: (1) it is discoverable, without restriction; (2) it is discoverable, but requires protection from unnecessary disclosure; or (3) it is protected by a privilege and, thus, not discoverable.

*Physician and Psychotherapist-Patient Privilege*

¶107. The Diocese claims some of the requested documents are protected by the psychotherapist - patient privilege provided by Rule 503 of the Mississippi Rules of Evidence.

¶108. In certain cases of alleged sexual molestation of children, the Diocese referred the accused priest and the victim to doctors and therapists for treatment and counseling. The Diocese paid for the treatment and counseling, and received reports from the treating doctors and therapists. The priests and victims waived the privilege to the extent that the treating physicians and therapists could send updates and treatment summaries to the diocese.

¶109. The priests and victims clearly qualify as "patient[s]" under Miss. R. Evid. 503(a)(1). The treating doctors and therapists clearly qualify as "physician[s]" and "psychotherapist[s]" under Miss. R. Evid. 503(a)(2) and (3), respectively. This brings us to the question of whether the information requested qualifies as "*confidential*". Rule 503(4) provides:

> A communication is "*confidential*" if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

49

¶110. The patients agreed that the otherwise privileged information could be provided to the Diocese. Thus, the "communication" was intended by the patients to be "disclosed to third persons," seemingly removing it from the definition of "confidential." However, we have never held that a limited waiver of the privilege which allowed specific information to be provided to specified persons or entities, serves to waive the privilege generally, or as to other third persons not included in the waiver. Were we to so hold, the privilege would be, for all practical purposes, emasculated. For instance, patients customarily waive the privilege to the extent their insurance companies require privileged information for the payment of claims. Such limited waivers, however, have never served to waive the privilege generally, for those insured patients. A general waiver of the privilege occurs where the patient clearly intends it generally waived, or where the waiver is such that the patient can no longer reasonably expect the communication to remain confidential.

¶111. While it is true that the priests and victims waived the privilege, allowing disclosure of the information to the Diocese, we find no evidence or indication that the waivers were intended to be general. Under the circumstances, we cannot say that, because the information was disclosed to the Diocese, the patients no longer expected the communications to remain confidential. Therefore, we hold that documents in the possession of the Diocese which qualify under Rule 503(b)[21] remain privileged, and may not be produced to the Morrisons, absent a waiver pursuant to Rule 503(c),

---

[21]Rule 503 protects "confidential communications made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition...among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family." Miss. R. Evid. 503(b)

50

which provides in pertinent part: "The privilege may be claimed by the patient, his guardian or conservator, or the personal representative of a deceased patient." All documents the Diocese intend to be withheld from production based upon the privilege should be included in the privilege log discussed infra.

*Self-Critical Analysis*

¶112.   The Diocese argues that documents it created for the purpose of self-analysis and criticism – that is, documents it created in an attempt to identify and address its problems – should be protected from disclosure as a matter of public policy. The obvious justification for such a privilege is that it would seem counterproductive to the interests of the public to discourage wrongdoers from making efforts to correct problems. Allowing the production of such documents would tend to discourage self-analysis, self-criticism, and thus self-improvement.

¶113.   The argument is novel in Mississippi and somewhat appealing. However, we find no case where the federal or state courts have recognized this privilege, and it is not included in the privileges enumerated in either the federal or Mississippi Rules of Evidence.

¶114.   The United States Court of Appeals for the Fifth Circuit has examined the privilege of self-critical analysis on several occasions, and has, on each occasion, declined to recognize it as a legal privilege. Its most recent decision held:

> As for the self-evaluation privilege, Fed.R.Evid. 501 states that privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." The Fifth Circuit has not recognized the self-evaluation privilege**....**

51

*In re Kaiser Aluminum & Chem. Co.,* 214 F.3d 586, 593 (5th Cir. 2000) (citations omitted).[22]

¶115. Although we do not find the argument totally unpersuasive, we decline at this time to recognize or establish this privilege. Thus, self-critical documents may not be included in the privilege log discussed infra.

### Priest-Penitent

¶116. The Diocese also seeks protection from production of certain documents pursuant to the Priest-Penitent privilege, codified at Miss. R. Evid. 505. The general rule of the privilege is: "A person has a privilege to refuse to disclose and prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser." Miss. R. Evid. 505(b).

¶117. Although the diocese claims this privilege for most files, it does not apply unless the communication was made "to a clergyman [or woman] in his [or her] professional character as spiritual adviser." Miss. R. Evid. 505(b). Most of the documents claimed to be protected were clearly not directed to anyone in their "professional character as spiritual adviser." Such documents are therefore not protected by this privilege. However, several documents we reviewed, such as letters seeking spiritual guidance or intercessory prayer, obviously fall under the protection of this privilege, and must not be provided to the Morrisons, absent a waiver of the privilege. The Diocese must list all such documents in the privilege log, discussed infra.

---

[22]The self-evaluation privilege is also known as the "self-critical analysis" privilege. *In re Kaiser Aluminum & Chem. Co.,* 214 F.3d 586, 593 n.20 ( 5th Cir. 2000).

*Attorney-Client*

¶118.  Perhaps the most familiar of the privileges is that which protects certain communications between attorneys and their clients.  Mississippi's attorney-client privilege provides that  "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of facilitating the rendition of professional legal services to the client....."  Miss. R. Evid. 502(b).  Rule 502(a) defines several terms as they apply to this privilege.  A "client" can be an individual or public or private entity while a "lawyer" is one authorized, or reasonably believed to be authorized, to practice law.  Miss. R. Evid. 502(a).  A communication qualifies as "confidential" if it was not intended to be disclosed to a third party except as necessary to render legal services.  According to the comments, "The test for confidentiality is intent. . . .  Intent can be inferred from the particular circumstances."  Miss. R. Evid. 502 cmt.

¶119.  The Diocese asserts the privilege for numerous documents which do not qualify.  However, the privilege absolutely (and obviously) protects several documents we reviewed which were transmitted between the Diocese and its attorney.  For example, one file contains a memorandum summarizing a litigation strategy meeting of the Diocese, its attorney, and its insurance provider.  The representative of the Diocese in attendance wrote the memo to a Bishop, informing him of attorney recommendations, trial strategy, and issues of coverage.

¶120.  Another protected communication is a letter from a Boston attorney to a Jackson attorney discussing representation of a Church official in litigation.

¶121.    Finally, we located several letters transmitted between the Diocese, a local Jackson law firm, and an Atlanta law firm, concerning a priest being sued in Georgia.  These letters discuss litigation and include a log of work performed.  These three examples of protected correspondence were found after a cursory look through some of the files.

¶122.    The Diocese has an Investigative Review Committee which meets periodically to discuss parishioners and former parishioners who claim to have been molested, and who have made requests for assistance.  The diocese claims the minutes of these meetings are protected by the privilege.  While it is true that an attorney was present at each of these meetings, we found no statements to or from the attorney which could remotely be construed as advice "facilitating the rendition of professional legal services."   Should the Diocese locate minutes, or portions of minutes, it believes in good faith represent communications with an attorney which constitute advice "facilitating the rendition of professional legal services," such documents must be included in the privilege log.  Indeed, the Diocese must carefully review all documents and include those it claims are privileged in the privilege log which we discuss in detail infra.

   *Work Product*

¶123.    The "work product" privilege is found at Rule 26(b)(3) of the Mississippi Rules of Civil Procedure.  This privilege protects documents prepared in anticipation of litigation, unless the party seeking discovery has a substantial need of the materials and is unable without undue hardship to obtain the equivalent of the materials by other means.  Even where such documents are, upon appropriate showing, deemed discoverable, "the court shall protect against disclosure of the mental

54

impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Miss. R. Civ. P. 26(b)(3).

¶124. With respect to the meetings of the Investigative Review Committee, the privilege may partially protect some of the minutes. Most of the discussion in committee meetings were unrelated to pending or threatened litigation but, rather, centered around attempts by the Diocese to render assistance to priests and victims. There is no indication in the minutes or elsewhere that most of these discussions by the committee members were anything other than legitimate and sincere attempts to render aid to the victims and provide help for the priests. However, there was, on occasion, discussion of both specific pending litigation and specific threats of litigation. The Diocese must review all of the minutes and include in the privilege log all portions it claims are protected by the privilege.

*First Amendment privilege*

¶125. This Court has never recognized a privilege under the First Amendment to refuse to produce religious-oriented documents. We decline to do so today.

*Violation of Privacy Rights arising under Canon law and Doctrine of Church Autonomy*

¶126. No statute, regulation, or case recognizes a privacy right under Canon law in the Mississippi civil courts. Similarly, no statute, regulation, or case in Mississippi has adopted the Doctrine of Church Autonomy as a bar to discovery, and we shall not adopt it today.

*Privilege Log and in-camera review*

55

¶127. We are aware that the trial judge ordered the requested documents and responses to interrogatories delivered to his chambers for an in-camera inspection. However, without finding a single document or interrogatory response protected by any privilege, the trial judge ordered the Diocese to produce all documents and interrogatory responses. We find this decision by the trial court to be an abuse of discretion. Our review of the same documents produced to the trial court revealed some which were clearly protected by the attorney/client privilege. Additionally, the documents included medical records of third persons not involved in this litigation, as well as the names and other personal information of victims of child molestation. The privileged documents should have been excluded from the required production under the trial judge's discovery order, and the names and personal information of innocent victims of child molestation should have been protected from public disclosure.

¶128. If the documents were presented to the trial court in the same manner as produced here, the Diocese is not without fault. No privilege log was included, and the privileges were asserted in such a general, sweeping manner as to border on the frivolous. It was the professional responsibility of counsel for the Diocese to carefully review the requested documents and specifically identify those documents and portions of documents for which it, in good faith, claims are privileged. The failure of the Diocese to precisely assert privilege as to particular documents resulted in a difficult task for the trial judge which, in turn, resulted in an order that all documents be produced. While one could argue that, for the most part, the Diocese has no right to complain, the same cannot be said for the innocent victims who have no voice in this litigation.

¶129. Accordingly, we direct the Diocese to produce within 30 days of the issuance of this Court's mandate all interrogatory responses and documents it does not, in good faith, claim are privileged. For documents and responses it claims are privileged, we direct the Diocese to provide to the trial court a detailed privilege log in which each such response and document, and portion of a response or document, claimed to be privileged is listed and identified by file name, document number, and privilege claimed. We further direct the trial court to review, in camera, each response and document claimed to be privileged, and for each such response and document to state whether it is protected by a privilege. For those which are protected, the trial court must state which asserted privilege or privileges protect the response or document. For those which are not protected, the trial court must provide detailed findings as to why each asserted privilege does not apply.

¶130. Additionally, the trial court is directed to take reasonable steps to protect the identity and personal information of persons identified as victims of child molestation.

## CONCLUSION

¶131. Neither the Doctrine of Church Autonomy nor jurisdictional arguments shall serve to prevent the Morrisons from pursuing their causes of action in our civil courts. The civil and criminal laws which protect children from abuse and allow those who are abused to be compensated for the damage they suffer, are neutral, generally applicable laws. They have, at best, a de minimis effect on any religious organization's internal, ecclesiastical matters. We find no credibility in the argument that immunity from liability for damages caused by pedophiles should be grounded in religious faith, doctrine, practice or belief, regardless of any theory under which that argument is advanced.

57

¶132. Accordingly, we find the Circuit Court of the First Judicial District of Hinds County has jurisdiction over the causes of action asserted by the Morrisons, and this lawsuit shall proceed, and discovery shall take place, in a manner consistent with this opinion.

¶133. We affirm the circuit court's judgment denying the motion to dismiss. We vacate the circuit court's discovery order, and we remand this case for further proceedings consistent with this opinion.

¶134. **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

**WALLER AND COBB, P.JJ., AND CARLSON, J., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. SMITH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY EASLEY, J. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**

**SMITH, CHIEF JUSTICE, DISSENTING:**

¶135. The majority finds that the Circuit Court of the First Judicial District of Hinds County has jurisdiction over the causes of action asserted by the Morrisons, so therefore, their lawsuit against the Diocese can proceed on all issues raised and that discovery will also proceed. The majority bases its opinion on the fact that "[t]he civil and criminal laws which protect children from abuse, and allow those who are abused to be compensated for the damage they suffer, are neutral, generally applicable laws." Further, the majority holds that the First Amendment Establishment Clause, Free Exercise Clause and Doctrine of Church Autonomy are not applicable here.

¶136. The majority is incorrect in its jurisdictional analysis, and accordingly, the claims against the Diocese should be dismissed. It follows that a discussion of the discovery issue presented on appeal

58

is not appropriate since there is no jurisdiction. Each case stands or falls on its own set of facts. Here, each of the tortious acts alleged in this case can be summed up in two words: clergy malpractice. Since the First Amendment Doctrine of Church Autonomy precludes the circuit court from asserting jurisdiction over claims which arise from the manner in which the Catholic Diocese selected, appointed, disciplined, and supervised its clergy, I must respectfully dissent.

¶137. As noted by the majority, Dorothy Morrison and her three children filed suit in the Circuit Court of the First Judicial District of Hinds County claiming civil conspiracy, breach of fiduciary duty, intentional or negligent infliction of emotional distress, fraud and fraudulent concealment, negligent hiring, assignment, and retention, negligent misrepresentation, and negligent supervision. The Morrisons allege that the Bishop of the Diocese negligently assigned, supervised, and retained a priest, George Broussard, and tortiously spoke or failed to speak about him, thereby allowing him to molest the brothers. The Morrisons are attempting to convince this Court to allow a civil court to assert its state power to regulate the manner by which a Catholic bishop selects, assigns, supervises, and disciplines his priest, as well as what he does or does not say about the priest to the parishioners.

¶138. On March 14, 2003, in response to the complaint filed by the Morrisons, the Catholic Diocese of Jackson [hereinafter the Diocese] and Bishop Houck filed a motion to dismiss for lack of subject matter jurisdiction, which was supported by three affidavits and a brief. The Morrisons did not file a response to that motion. During the March 24, 2003, oral argument, the circuit judge indicated that he had read the complaint and the motion, but never mentioned the uncontested thirty-four page brief in support of the motion or the three attached affidavits. The circuit judge failed to consider the very

59

important threshold issue regarding the constitutionality, or lack thereof, of the circuit court asserting jurisdiction over the relationship between a bishop and his priest, which inevitably requires the court to delve into issues of faith, church policy, and the theological doctrines which define that relationship. Instead of considering this, the circuit judge simply denied the motion to dismiss from the bench, without affording any explanation whatsoever of his reason therefor.

¶139. As noted in the record, each of the three Morrison brothers alleged that George Broussard, a former priest, sexually abused them thirty years ago, from 1970 to 1974. When their father, Dr. Morrison, learned of the abuse in 1973, he promptly confronted Broussard and reported the abuse to the Vicar General of the Diocese as well as to the Diocese officials. Dr. Morrison had *actual notice* in 1973 of the abuse, so therefore, their claims are barred by the statute of limitations. Likewise, the actual notice of injury defeats the Morrisons' claims of fraud and fraudulent concealment, as the purpose thereof is to toll a statute of limitations when the existence of the injury was actively concealed by the wrongdoer's affirmative misconduct. Two years after Dr. Morrison reported the abuse, Broussard left the priesthood. Bishop Joseph B. Brunini, now deceased, was Bishop of the Diocese of Jackson from 1970 through 1974.

¶140. By concluding that the circuit court has jurisdiction over clergy malpractice claims, the majority is allowing a civil court to become excessively entangled in the adjudication of claims that are grounded in internal religious matters. This Court has consistently held that ecclesiastical questions are not "for the civil courts. The church authorities . . . are supreme in such matters. Their decision is final as to who shall be the pastor and other officers. Such disputes *are ecclesiastical in their nature and the*

60

*courts have no control over them.*" ***Grantham v. Humphries***, 185 Miss. 496, 188 So. 313 (1939) (emphasis added). Over a century ago, in ***Watson v. Jones***, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), the United States Supreme Court established that church autonomy was a constitutional, structural restraint on governmental power. ***Watson*** reached this result by reasoning, first, that civil courts are not allowed to invade the church's sphere of authority. *Id*. By doing so, the Supreme Court blatantly rejected Lord Eldon's Rule, adopted in England, whereby a civil court would resolve disputes by discerning which faction followed traditional doctrine and which departed from such doctrine. ***Watson v. Jones***, 80 U.S. (13 Wall.) at 727. This "departure from doctrine" methodology may have been appropriate in England, with its established church, but it was not appropriate in the United States. *Id.* at 728. Secondly, ***Watson*** recognized that the dispute was not ultimately about property, but instead, about the manner in which the church would select pastoral leaders to preach the Gospel and inculcate faith. *Id.* at 732. Here, the dispute is not ultimately about sexual molestation, but it is about the manner by which bishops hire, assign, supervise and remove priests from their respective posts. In accordance with the reasoning of ***Watson***, since civil courts are "incompetent judges of matters of faith, discipline, and doctrine," they must decline jurisdiction over such cases. *Id.*

¶141. Likewise, ***Watson*** also held that civil adjudication of most church-related disputes would cause the judicial branch to become excessively entangled in ecclesiastical matters. The United States Supreme Court stated:

61

It is easy to see that if the civil courts are to inquire into al these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must be examined into with minuteness and care, for they would become, in almost every case, the *criteria* by which the validity of the ecclesiastical decree would be determined in the civil court.

*Watson v. Jones*, 80 U.S. (13 Wall.) at 733 (emphasis in original). Common sense mandates the recognition of the rule that requires the court to defer to the highest church judicatory because "[a]ll who unite themselves to [a church] do so with an implied consent to this government, and are bound to submit to it." *Id.* at 729. *See also **Dees v. Moss Point Baptist Church***, 17 So. 1, 1 (Miss. 1895) ("Every person uniting with the Baptist church impliedly or expressly covenants obedience to its laws, and by that covenant this appellant is bound.").

¶142. In *Carothers v. Moseley*, 99 Miss. 671, 55 So. 881 (1911), this Court recognized *Watson* as the "leading case" regarding church autonomy. Similarly, in *Mt. Helm Baptist Church v. Jones*, 79 Miss. 488, 30 So. 714, 716 (1901), this Court stated that it "exercises no ecclesiastical jurisdiction. It accepts what the highest ecclesiastical authority in each church promulgates as the faith and practice of that church." In *Sustar v. Williams*, 263 So. 2d 537, 540 (Miss. 1972), this Court held that Mississippi "courts . . . accept the highest ecclesiastical authority in each church as being the faith and practice of that church."

¶143. In *Malicki v. Doe*, 814 So. 2d 347, 355 (Fla. 2002), the Florida Supreme Court stated that "[a]lthough the United States Supreme Court has often discussed this principle [the Doctrine of Church Autonomy] in the context of the Free Exercise Clause, *see **United States v. Lee***, 455 U.S.

252, 256, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); **Kedroff v. St. Nicholas Cathedral**, 344 U.S. 94, 107-08, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the United States Supreme Court has also referred to this principle in the context of the Establishment Clause." *See **Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l. Presbyterian Church***, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). The Florida Supreme Court concluded that "[i]t is apparent that the religious autonomy principle articulated by the United States Supreme Court may implicate both the Free Exercise Clause and the Establishment Clause." **Malicki v. Doe**, 814 So. 2d at 355. Clearly, in this case, the First Amendment Doctrine of Church Autonomy precludes a civil court from improperly entangling itself in such an intrinsically religious matter.

¶144. The majority improperly finds that civil courts have jurisdiction over claims arising from what a bishop says about his priest and from how he supervises or disciplines a priest. The Morrisons contend that this jurisdiction is comparable to claims arising from a car dealer's supervision of a salesman. Such analysis cannot begin to compare to a First Amendment claim as set out by the Diocese here. The undisputed evidence contained within the record shows that the relationship between a bishop and priest bears little resemblance to the secular relationship between an employer and his employee. Instead, the relationship between and bishop and his priest is one that is created and defined entirely by ordination vows, sacramental theology, and canon law. In his affidavit, Bishop Houck explained that, according to Canon 375 § 1, a bishop's ministry includes the governance of the Diocese and its priests:

63

Bishops are 'constituted pastors in the Church, so they are teachers of doctrine, priests of sacred worship, and the ministers of governance.' A bishop's ministry of governance is an important part of his pastoral care of his diocese. Bishops have been established by Christ the Lord as 'shepherds of the People of God' and are 'endowed by Christ with a special outpouring of the Holy Spirit' to act as 'vicars and legates of Christ,' governing the diocese assigned to them . . . .

¶145. In its brief, the Diocese states that "[f]rom a secular point of view, it could be said that 'supervision' of priests is an important portion of a bishop's *work*. But from the Catholic Church's vantage, such supervision is an important portion of a bishop's *ministry*–a ministry informed by Scripture, faith, teaching, and tradition." Bishop Houck continued to explain that the bishops are governed by the "promptings of the Holy Spirit." He stated:

As a minister of governance, the decisions of a bishop are to be both informed and circumscribed by the promptings of the Holy Spirit, and the requirements of Sacred Scripture, Tradition, Magisterial Teaching, and *The Code of Canon Law*. Bishops strive to imitate Christ, the Good Shepherd, by taking time apart to pray and to be filled with God's wisdom. A bishop's decisions regarding ordination, appointments, assignments, re-assignments, discipline, and laicization of priests are likewise made prayerfully and in this full context of striving to imitate the Good Shepherd, as that vocation is understood within the Roman Catholic Church. Accordingly, a bishop's interactions with the priests under his care are only *properly understood as part of the bishop's ministry as Christ to the Church.*

(Emphasis added). Bishop Houck further explained that because the Roman Catholic Church is hierarchical "a bishop's decisions with regard to his priests–including . . . their calling, formation, assignment, and discipline–are decisions by the highest Diocesan legislator, judiciary, and executive." Unlike secular institutions, which rely on rational knowledge in conducting their affairs, the Catholic Church seeks to order itself and conduct its mission in accordance with revealed truth. Bishop Houck further stated that priests are ordained ministers, which are called by God to serve the Church, and

64

the "duties of a priest are defined by the Sacred Scripture, Tradition, Magisterial Teaching, and *The Code of Canon Law*." According to *The Canon Law*, the bishop is required to provide the priest with the opportunity to carry out his ministry for life. Also, when a bishop is faced with the possibility of disciplining or removing a priest from the office assigned to him, he is called upon to obey the "wisdom and demands fo the Scriptures, teachings of the Church, and the requirements of the Code."

¶146. The United States Supreme Court has held that "the First Amendment prevents courts from resolving internal church disputes that would require adjudication of questions of religious doctrine." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). *See also Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l. Presbyterian Church*, 393 U.S. at 449; *Kedroff v. St. Nicholas Cathedral*, 344 U.S. at 107-08. Importantly, before the constitutional right to free exercise of religion is implicated, the threshold inquiry is whether the conduct sought to be regulated was "rooted in religious belief." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Stated another way, the threshold inquiry that must first be determined is whether or not the dispute is one about internal church matters or one that is secular in nature. The United States Supreme Court held that courts must determine whether the dispute is an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law, or whether it is a case in which it should hold religious organizations liable in civil courts for disputes which are purely secular between third parties and a particular defendant, albeit a religiously affiliated organization. *Serbian E. Orthodox Diocese*, 426 U.S. at 713, 96 S.Ct. 2372.

65

The Supreme Court further held that it is not even within the judicial function and judicial competence of civil courts to determine which of two competing interpretations of scripture are correct. *United States v. Lee*, 455 U.S. 252, 256, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). Instead, civil courts must defer to the interpretations of religious doctrine made by the "highest ecclesiastical tribunal." *Serbian E. Orthodox Diocese*, 426 U.S. at 709, 96 S.Ct. 2372. Thus, the First Amendment provides churches with the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116, 73 S.Ct. 143. In *Malicki v. Doe*, 814 So. 2d at 347, the Florida Supreme Court stated that this type of protection afforded by the First Amendment is referred to as the religious autonomy principle.

¶147.  To adjudicate the claims of the Morrisons under this set of facts before us a court would have to evaluate the relationship between a bishop and his priest, the theological doctrines informing as well as defining that relationship, and the pronouncements that a bishop made or failed to make about that relationship. Hence, it is inescapable that the civil jury would then either have to immerse itself in theological criteria in order to determine the duties of a "reasonable bishop" or in the alternative, define a bishop's duties without regard to whether those duties ran afoul of Church teachings, solemn vows, religious tradition, or canon law. Either of these options is unacceptable because the First Amendment unambiguously places these issues beyond the reach of the jurisdiction of civil courts. Adjudication of the Morrisons' claims would involve determining a reasonable standard of care for a Catholic bishop in exercising his ministry of discipline and governance. This is precisely what is not permitted by many precedents rejecting jurisdiction over claims of clergy malpractice.

66

¶148. Although the majority cites to jurisdictions which allow civil courts to exercise jurisdiction over cases that claim church officials negligently hired, assigned, supervised, or retained clergy or other ministers, there are equally many other jurisdictions which do not allow such claims. For example, the U.S. District Court in Colorado rejected clergy malpractice claims that a Catholic priest had sexually abused a minor, by stating that:

> [f]or this Court to insert itself into the process by which priests are chosen would substantially burden these Defendants' free exercise of a crucial power to control the future of the church and therefore constitute interference with the practice of their religion.
>
> It would also cause excessive entanglement in church operations by fostering inappropriate government involvement. The application of even general tort principles of law would require an inquiry into present practices with an intent to pass on their reasonableness.

*Ayon v. Gourley*, 47 F. Supp. 2d 1246, 1250 (D. Colo. 1998) *aff'd*, 185 F.3d 873 (10th Cir. 1999). *See also* *Roppolo v. Moore*, 644 So. 2d 206 (La. Ct. App. 1994); *Bryan R. v. Watchtower Bible & Tract Soc'y*, 738 A.2d 839 (Me. 1999); *Swanson v. Roman Catholic Bishop of Portland*, 692 A.2d 441 (Me. 1997); *Mulinix v. Mulinix*, 1997 WL 585775 (Minn. Ct. App. 1997); *Gray v. Ward*, 950 S.W.2d 232 (Mo. 1997); *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. 1997); *Langford v. Roman Catholic Diocese*, 705 N.Y.S.2d 661 (N.Y. App. Div. 2000); *Heroux v. Carpentier*, 1998 WL 388298 (R.I. Super. Ct. 1998); *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 780 (Wis. 1995); In *Ehrens v. Lutheran Church-Missouri Synod*, 269 F. Supp. 2d 328 (S.D.N.Y. 2003), the court held that the First Amendment barred negligent

supervision claims even when the minister who caused the injury committed multiple sexual assaults against a minor.

¶149. As previously noted, each of the Morrisons' claims are essentially nothing more than poorly disguised or camouflaged clergy malpractice claims. The Morrisons allege that Bishop Brunini should have conducted his sacramental duties and ministry of governance differently–that he should have better determined Broussard's fitness for ordination and assignment, that he should not have ordained Broussard, that he should have given Broussard different priestly assignments, and that he should have spoken differently and more critically of Broussard. Each of these claims requires a civil court to establish a standard of care for a Catholic bishop with regard to his episcopal duties. As evidenced by the record, the Morrisons have repeatedly and expressly alleged that the bishop of the Diocese committed professional "negligence," which is nothing more than a clergy malpractice claim. Again, the Doctrine of Church Autonomy requires the dismissal of clergy malpractice claims because the adjudication thereof would cause a court to define the "reasonable" duties of a clergy person. This concept is best described in *Schmidt v. Bishop*, 779 F. Supp. 321, 327-28 (S.D.N.Y. 1991), where the court stated that:

> Any effort by this Court to instruct the trial jury as to the duty of care which a clergyman should exercise, would of necessity require the Court or jury to define and express the standard of care to be followed by other reasonable Presbyterian clergy of the community. This in turn would require the Court and the jury to consider the fundamental perspective and approach to counseling inherent in the beliefs and practices of that denomination. This *is as unconstitutional as it is impossible. It fosters excessive entanglement with religion.*

68

It may be argued that it requires no excessive entanglement with religion to decided that reasonably prudent clergy of any sect do not molest children. The *difficulty here is* that this Court, and the New York court whose authority we exercise here, *must consider not only this case, but the next case to follow, and the ones after that, before we embrace the **newly invented tort of clergy malpractice.*** This places us clearly on the **slippery slope** and is an unnecessary venture, since existing laws against battery, and the criminal statute against sexual abuse if timely invoked, provide adequate protection for society's interest.

(Emphasis added). The Morrisons also claim a breach of fiduciary duty, which, like clergy malpractice, the fiduciary obligation arises from the alleged position of trust held by a member of the clergy, necessarily requires a civil court to define a clergyperson's professional obligations and inevitably entangles the court in the matters of faith, doctrine, canon law, and ecclesiastical relationships.

¶150. Every aspect of the Morrisons' allegations against the Diocese and its bishops involves the relationship between the Catholic Diocese and one of its priests. The First Amendment Doctrine of Church Autonomy bars such claims because they involve the church-minister relationship, which has been found to be of an intrinsically religious nature. This Court, as well as the Court of Appeals, has applied to the Doctrine of Church Autonomy to hold that minister-church disputes fall outside the subject matter proper to civil courts. *See Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir. 1974); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972); *See also Conic v. Cobbins*, 208 Miss. 203, 44 So. 52 (1950), *Mallette v. Church of God Int'l*, 789 So. 2d 120 (Miss. Ct. App. 2001 ).

¶151. The Morrisons also repeatedly allege that the Diocese and its bishop failed to communicate properly with them and other members of the Diocesan church regarding the character and moral fitness of Broussard. They contend that this Court should impose a duty upon the Catholic Diocese of Jackson to inform parishioners if its priests are not men "of good moral character, fit to be a priest . . . ." Without any allegation indicating that Bishop Brunini and/or the Diocese had any prior knowledge that Broussard was unfit to perform his priestly duties, the Morrisons ask this Court to impose, as a matter of civil law, an affirmative duty upon churches to announce the moral failings of their ministers. Many precedents, in Mississippi and elsewhere, establish that government courts have no power to determine how or when a church speaks or chooses to remain silent on a great variety of ecclesiastical subjects, including anything that touches upon the church-minister relationship. These precedents articulate the scope of *Watson* to include the removal of church communications from judicial oversight. *See EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 284 (5th Cir. 1981). *See also United States v. Ballard*, 322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148 (1944); *Tilton v. Marshall*, 925 S.W.2d 672 (Tex. 1996); *Tran v. Fiorenza*, 934 S.W.2d 740 (Tex.App. 1996).

¶152. The crux of the all of the Morrisons' claims is that the Diocese and its bishop were negligent in the manner in which they assigned, hired, supervised, and retained Broussard. As stated earlier, each of the seven claims are variations on this central theme. These claims particularly violate the First Amendment Doctrine of Church Autonomy because they simultaneously involve a church-minister relationship, the professional standard of care for a Catholic bishop exercising his ministry of

70

governance, and the decisions of the ecclesiastical authority within a hierarchical church regarding an individual serving in ordained ministry. The Southern District Court of New York, in invoking *Watson* and its progeny, stated that:

> [A]ny inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement [as claims of clergy malpractice] which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs . . . The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millennia.

*Ehrens v. Lutheran Church-Missouri Synod*, 269 F. Supp. 2d at 328.

¶153. The Mississippi Court of Appeals recently affirmed Mississippi's long history of respecting the boundaries between church and state when it declined a plaintiff's invitation to find jurisdiction over a defamation claim arising out of a religious context. In *Mallette v. Church of God Int'l*, 789 So. 2d 120 (Miss. Ct. App. 2001), the Mississippi Court of Appeals rejected the defendant's request to distinguish between intentional and other types of torts, explaining:

> A civil court is forbidden, under the First and Fourteenth Amendments to the United States Constitution, from becoming involved in ecclesiastical disputes. In *Serbian Eastern Orthodox Diocese v. Milivojevich*, 425 U.S. 696, 709 (1976), the United States Supreme Court held that in accordance with the doctrine of ecclesiastical abstention, "civil court shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them." This abstention doctrine includes church-related questions of discipline, faith, rule, custom, or law.

789 So. 2d at 123-24 (internal citations omitted). The *Mallette* court also concluded that "[t]he disciplining of a minister is church-related and the doctrine of ecclesiastical abstention requires us to

71

abstain from questioning the manner of Mallette's discipline." *Id.* at 124. Here, Bishop Houck's affidavit explains that (1) at the time of the alleged abuse Bishop Brunini was the highest ecclesiastical authority for the Diocese of Jackson, and (2) that the "faith and practice" of Bishop Brunini regarding governance and discipline of priests, like Broussard, was central to Bishop Brunini's ministry and was "informed and circumscribed by the promptings of the Holy Spirit, and the requirements of the Sacred Scripture, Tradition, Magisterial Teaching, and *The Code of Canon Law.*" The majority improperly permits the Morrisons' request for a court or jury to second-guess Bishop Brunini's decisions about how he governed the Diocese and this particular priest thirty years ago, and in doing so, simply ignores Mississippi's century-old jurisprudence regarding the correct legal relationship between church and state. While Broussard may be completely liable for his actions, if proven, the circuit court lacks jurisdiction to consider the Morrisons' claims against the Diocese.

¶154. For these reasons, I cannot agree with the majority's opinion allowing the circuit court to exercise jurisdiction over issues involving what is clearly a claim of clergy malpractice. I would reverse the circuit court's judgment denying the motion to dismiss and the circuit court's order compelling discovery, and I would render judgment dismissing this case for lack of subject matter jurisdiction. Therefore, I respectfully dissent.

**EASLEY, J., JOINS THIS OPINION IN PART.**

72

# APPENDIX A

## CASES FINDING NO FIRST AMENDMENT BAR TO CIVIL LITIGATION

**Federal cases:**

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409 (2d Cir. 1999) (plaintiff accused former priest of sexual abuse when he was a teenager; held: no First Amendment bar on courts deciding secular civil disputes involving religious institutions since claim brought under state law and not church law and jury not required to resolve any disputed religious issues)

*Doe v. Norwich Roman Catholic Diocesan Corporation,* 268 F. Supp. 2d 139 (D. Conn. 2003) (former parishioner alleged sexual abuse by priest when she was a teenager; held: no entanglement of the court in the church's religious doctrines and practices in violation of the First Amendment when adjudicating claims for negligent hiring and supervision)

*Smith v. O'Connell,* 986 F. Supp. 73 (D.R.I. 1997) (plaintiffs allege sexually abused by priests while minors; held: secular courts have jurisdiction in cases of church officials' alleged failure to take appropriate action to prevent sexual assaults by clergy subject to their authority)

*Doe v. Hartz,* 970 F. Supp. 1375, 1431-32 (N.D. Iowa 1997), *rev'd in part on other grounds,* 134 F.3d 1339 (8th Cir. 1998) (parishioner accused clergy of sexual misconduct; held: no First Amendment bar to claims of negligent supervision of clergy because court will apply neutral principles of law with no inquiry into church doctrine but First Amendment does bar claims of negligent hiring and negligent retention because their adjudication requires inquiry into church doctrine)

*Sanders v. Casa View Baptist Church,* 898 F. Supp. 1169, 1175 (N.D. Tex. 1995), *aff'd,* 134 F.3d 331 (5th Cir. 1998) (pastor engaged in a sexual relationship with both plaintiffs who had separately come to him for marriage counseling; held: no bar to claims of professional negligence and breach of fiduciary duty because the inappropriate conduct was not grounded in the beliefs or practices of the church)

*Nutt v. Norwich Roman Catholic Diocese,* 921 F. Supp. 66 (D. Conn.1995) (brothers accused priest of sexual abuse while they were altar boys; held: no First Amendment bar for claim of negligent supervision against church because no imposition nor prejudice to any of the religious tenets or practices of Catholicism)

*Isley v. Capuchin Province*, 880 F. Supp. 1138 (E.D. Mich. 1995) (student allegedly abused by two priests; held: no First Amendment bar to negligent supervision claim but questions of negligent hiring and retention are barred because adjudication would require interpretation of church doctrines)


**State cases:**


**California:**

*Roman Catholic Bishop of San Diego v. Superior Court of San Diego County*, 42 Cal.App.4th 1556, 50 Cal.Rptr.2d 399 (1996) (fifteen year old plaintiff accused priest of engaging in regular and repeated childhood sexual abuse; held: no First Amendment bar protecting the church from liability but since plaintiff could plead no facts of a prior history of sexual abuse of minors by priest, summary judgment is appropriate for the church on grounds of negligent hiring and supervision)

**Colorado:**

*Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988) (adult parishioner sought priest for marriage counseling which ended in a sexual relationship; held: neither clergy nor church entitled to First Amendment as a shield to tort liability from claims for breach of fiduciary duty, and negligent supervision)


*Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo. 1993) (a sexual relationship developed out of counseling sessions between an adult parishioner and priest; held: claims against bishop and diocese for breach of fiduciary duty, negligent hiring, and negligent supervision of priest not barred by First Amendment)

*Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315 (Colo. 1996)
(priest inappropriately touched child during counseling; held, First Amendment provides no shield to Church or priest from tort liability)

*Winkler v. Rocky Mountain Conference of the United Methodist Church*, 923 P.2d 152 (Colo. Ct. App. 1996) (adult parishioner alleged minister instigated several verbal and physical sexually inappropriate incidents; held: First Amendment does not bar claims of breach of fiduciary duty or negligent hiring or supervising)

**Connecticut:**

***Rosado v. Bridgeport Roman Catholic Diocesan Corp.,*** 45 Conn.Supp. 397, 716 A.2d 967 (1998) (plaintiffs allege that priest sexually abused them as minors; held: church defendants not entitled to First Amendment protection for claim of negligent supervision)

**Florida:**

***Doe v. Evans***, 814 So.2d 370 (Fla. 2002) (adult former parishioner accused pastor of sexual misconduct during a counseling relationship; held: no First Amendment shield protecting church from liability for harm caused to third party from alleged sexual misconduct by clergy)

***Malicki v. Doe***, 814 So.2d 347 (Fla. 2002) (adult and minor parishioner allege that they were sexually assaulted and battered by priest; held: no First Amendment shield protecting the church from liability for alleged tortious act by its clergy)

**Illinois:**

***Amato v. Greenquist***, 287 Ill.App.3d 921, 679 N.E.2d 446 (1997) (plaintiff's ex-wife engaged in an affair with a priest whom she later sought out for counseling; held: tort claims for negligent supervision not requiring "interpretation o f either religious doctrine or religious duties imposed on an individual by. . . a church" may be considered, however claim for breach of fiduciary duty not allowed because the relationship is grounded in religion)

***Bivin v. Wright***, 275 Ill.App.3d 899, 656 N.E.2d 1121 (1995) (pastor initiated sexual relationship with adult parishioner after she and her husband came to him for marriage counseling; held: First Amendment no bar to tort claims against church or minister when applying "neutral principles o f law" and without relying on interpretation of religious doctrine)

**Indiana:**

***Konkle v. Henson***, 672 N.E.2d 450 (Ind. Ct. App. 1996) (minister sexually molested child; held: First Amendment permits application of "secular standards to secular conduct" and is no bar for negligence claims against the church for negligent hiring and supervision of minister)

**Minnesota:**

***Odenthal v. Minnesota Conference of Seventh-Day Adventists***, 649 N.W.2d 426 (Minn. 2002) (minister allegedly engaged in improper conduct when counseling church member's wife; held: court will not become unconstitutionally entangled with religious doctrine, practice, or church polity in deciding a negligent-counseling claim)

iii

*Olson v. First Church of Nazarene*, 661 N.W.2d 254 (Minn. Ct. App. 2003) (married parishioner had sexual relationship with pastor whom she was seeing for private spiritual counseling; held: no First Amendment bar for judicial inquiry into the existence of an employment relationship for claims of negligent supervision, negligent retention and vicarious liability but inquiry into claim of intentional infliction of emotional distress would be constitutionally impermissible)

*Mrozka v. Archdiocese of St. Paul and Minneapolis,* 482 N.W.2d 806 (Minn. Ct. App. 1992) (child alleged sexual abuse by priest; held: First Amendment no bar to punitive damages claim against church)

**New Jersey:**

*F.G. v. MacDonell,* 150 N.J. 550, 696 A.2d 697 (1997) (priest engaged in inappropriate sexual conduct with adult parishioner during counseling; held: First Amendment no bar to claim of breach of fiduciary duty against clergy)

**New York:**

*Kenneth R. v. Roman Catholic Diocese,* 229 A.D.2d 159, 654 N.Y.S.2d 791 (1997) (priest sexually abused minor plaintiffs; held: First Amendment no bar to claims o f negligent supervision and retention against Church because defendant's conduct that caused claim is not founded in religious beliefs and practices)

*Jones by Jones v. Trane*, 153 Misc.2d 822, 591 N.Y.S.2d 927 (1992) (minor plaintiff alleges priest kissed and fondled him before swimming activities; held: no First Amendment protection for the church from negligent hiring claim)

**North Carolina:**

*Smith v. Privette,* 128 N.C.App. 490, 495 S.E.2d 395 (1998) (adult plaintiffs accused minister of sexual harassment and assault and battery; held: First Amendment no bar to claims against church for negligent retention and supervision of minister)

**Ohio:**

*Mirick v. McClellan*, 1994 WL 156303 (Ohio Ct. App. 1994) (Parents and their children alleged sexual abuse of the children by a Sunday school teacher at church; held: no First Amendment bar to the complaint but plaintiffs failed to plead with specificity the operative facts of the church's prior knowledge of the teacher's past conduct and so summary judgment was appropriate)

***Byrd v. Faber***, 57 Ohio St. 3d 56, 565 N.E.2d 584 (1991) (while husband and wife were attending marriage counseling, pastor allegedly forced wife into sexual relationship; held: no First Amendment bar to tort claims of negligent hiring when complaint pleads with specificity as to "operative facts")

**Oregon:**

***Erickson v. Christenson***, 99 Or. App. 104, 781 P.2d 383 (1989) (pastor engaged in sexual relations with minor during counseling; held: First Amendment no bar to tort claims)

**Texas:**

***Martinez v. Primera Asemblea de Dios, Inc***., No. 05-96-01458, 1998 WL 242412 (Tex.Ct.App. May 15, 1998) (church member allegedly abused by church elder; held: First Amendment grants no immunity to church or clergy for secular based tort acts of sexual assault)

**Washington:**

***C.J.C. v. Corp. of the Catholic Bishop of Yakima***, 138 Wash.2d 699, 985 P.2d 262 (1999) (three cases consolidated involving five plaintiffs who allege sexual abuse against priests, deacon, and pastor respectively; held: no First Amendment bar to claims against priest and church since liability based on secular conduct)

## APPENDIX B

## CASES FINDING A FIRST AMENDMENT BAR TO CIVIL LITIGATION

**Federal courts:**

*Dausch v. Rykse,* 52 F.3d 1425 (7th Cir. 1994) (pastor engaged in sexual relationship during a course of psychotherapy with parishioner; held: First Amendment bars claims of negligent hiring, negligent supervision, and breach of fiduciary duty against pastor and church)

*Ehrens v. Lutheran Church-Missouri Synod*, 269 F. Supp. 2d 328 (S.D.N.Y. 2003) (parishioner accused pastor of committing a series of sexual assaults against him while he was a minor; held: negligent hiring, supervision, and retention claims barred because defining a clergy's duty of care fosters excessive entangle with religion)

*Ayon v. Gourley,* 47 F. Supp. 2d 1246 (D. Colo. 1998), *aff'd on other grounds,* 185 F.3d 873 (10th Cir.1999) (unpublished decision) (priest allegedly engaged in a three year sexual relationship with a minor; held: both religion clauses of the First Amendment bar claims of negligent hiring, negligent supervision, and outrageous conduct against archdiocese because such claims require inquiry into church policy and doctrine)

*Doe v. Hartz,* 970 F. Supp. 1375, 1431-32 (N.D.Iowa 1997), *rev'd in part on other grounds,* 134 F.3d 1339 (8th Cir.1998) (parishioner accused clergy of sexual misconduct; held: claims of negligent hiring and negligent retention barred because their adjudication requires inquiry into church doctrine but no bar to claims of negligent supervision because court will apply neutral principles of law with no inquiry into church doctrine)

*Isely v. Capuchin Province*, 880 F. Supp. 1138 (E.D. Mich. 1995) (student allegedly abused by two priests; held: First Amendment bars questions of negligent hiring and retention because adjudication would require interpretation of church doctrines but no bar to negligent supervision claim)

*Schmidt v. Bishop,* 779 F. Supp. 321 (S.D.N.Y.1991) (parishioner accused pastor of inappropriate contact constituting sexual abuse in the second degree that began during counseling when she was a minor; held: First Amendment bars breach of fiduciary duty claim against pastor due to excessive entanglement of the courts in religion if required to "articulate a generalized standard of care for clergymen")

i

**State courts:**

**Louisiana:**

*Roppolo v. Moore*, 644 So.2d 206 (La. Ct. App. 1994) (husband sued diocese after wife committed suicide due in part to an alleged sexual relationship during counseling with an Episcopal priest; held: duty of care clergy should exercise during counseling equates to a claim for clergy malpractice and is therefore barred by the First Amendment)

**Maine:**

*Bryan R. v. Watchtower Bible & Tract Soc'y*, 738 A.2d 839 (Me. 1999) (parishioner alleged that an adult member of the church congregation sexually abused him during his adolescent years; held: state intervention prohibited when a court or jury would be called upon to determine the sufficiency of discipline, sanctions, or counseling between and church and its clergy)

*Swanson v. Roman Catholic Bishop of Portland*, 692 A.2d 441 (Me. 1997) (priest allegedly initiated a sexual relationship with a parishioner who had come to him with her husband for marriage counseling; held: negligent supervision claim, along with negligent selecting and training claims, barred by First Amendment)

**Michigan:**

*Teadt v. Lutheran Church Missouri Synod*, 237 Mich. App. 567, 603 N.W.2d 816 (1999) (sexual relationship between parishioner and minister arose out of a counseling relationship; held: breach of fiduciary duty of a pastor during counseling is equivalent to clergy malpractice which has not been adopted by any jurisdiction)

**Minnesota:**

*Mulinix v. Mulinix*, 1997 WL 585775 (Minn. Ct. App. Sept.22, 1997) (woman sued ex-husband who was a pastor, his church, and other denominational authorities after learning of alleged sexual contacts with parishioners during their marriage; held: claims of negligent retention and supervision between church and clergy barred by First Amendment)

**Missouri:**

*Gibson v. Brewer,* 952 S.W.2d 239 (Mo. 1997) (child claimed priest had touched or fondled him in a sexual, offensive, and unwelcome manner; held: claims of negligent hiring, ordaining, retaining and supervising of clergy by church are barred by First Amendment but no bar to claim of intentional failure to supervise priest)

*H.R.B. v. J.L.G.,* 913 S.W.2d 92 (Mo. Ct. App. 1995) (former student claimed he was sexually abused by a priest while attending a church-run school; held: adjudication of claim of breach of fiduciary duty against priest, church, and church officials requires impermissible inquiry into religious tenets)

**Rhode Island:**

*Heroux v. Carpentier*, 1998 WL 388298 (R.I. Super. 1998) (plaintiffs claim they were sexually molested as children by Roman Catholic priests; held: inquiry into claims of failure to exercise reasonable retention and supervision and failure to train plaintiff takes such as negligent hiring religious questions beyond its jurisdiction)

**Washington:**

*S.H.C. v. Sheng-Yen-Lu*, 54 P.3d 174 (Wash. Ct. App. 2002) (spiritual leader convinced adult plaintiff that sexual intercourse was necessary to cure her illness; held: First Amendment bars negligent retention and supervision claims because adjudication would require impermissible weighing of religious doctrine and beliefs)

**Wisconsin:**

*L.L.N. v. Clauder,* 209 Wis. 2d 674, 563 N.W.2d 434 (1997) (patient entered into a sexual relationship with priest counseling her through his position as a hospital chaplain; held: claim of negligent supervision barred because it could not be resolved on neutral principles but required inquiry into church law, policies and practices)

*Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 533 N.W.2d 780 (1995) (priest befriended parishioner as a high school student and the relationship later turned sexual; held: claims of negligent hiring, retention, training, and supervision against archdiocese barred because analysis of such issues requires entanglement into religious doctrine)